WICKHAM CONTRACTING CO., INC.
and Ralph Perone,
Plaintiffs-Appellees-Cross-Appellants,

v.

The BOARD OF EDUCATION OF the CITY OF NEW YORK, Hugh McClaren, Jr., Thomas Van Arsdale and Bernard Rosenberg, Defendants-Cross-Appellees,

Local Union Number 3, International Brotherhood of Electrical Workers, AFL–CIO, Defendant-Appellant-Cross-Appellee.

Nos. 210, 358, Dockets 82–7249, 7259.

United States Court of Appeals,
Second Circuit.

Argued Oct. 22, 1982.

Decided Aug. 5, 1983.

Norman Rothfeld, New York City, for defendant-appellant-cross-appellee Local Union Number 3, Intern. Broth. of Electrical Workers, AFL–CIO.

Irving B. Lampert, New York City, for plaintiffs-appellees-cross-appellants Wickham Contracting Co., Inc. and Ralph Perone.

Dody Schorr, Asst. Corp. Counsel of the City of New York, New York City (Frederick A.O. Schwarz, Jr., Corp. Counsel of the City of New York, Ronald E. Sternberg, Evelyn Jones, New York City, of counsel), for defendants-cross-appellees Bd. of Educ. of the City of New York.

Before OAKES and WINTER, Circuit Judges, and METZNER, District Judge.*

WINTER, Circuit Judge:

Local No. 3 of the International Brotherhood of Electrical Workers, AFL–CIO ("Local 3") appeals from a judgment holding it liable for violations of the Sherman Act, 15 U.S.C. § 1 (1976) and section 303 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 187 (1976). The jury awarded damages to the plaintiffs in the amount of $959,000 on the LMRA claim.

It also awarded $158,000 (trebled to $474,-000) on the antitrust claim, the final judgment including an additional $15,000 in attorney's fees. Allegations against Local 3 of violations of the Civil Rights Act, 42 U.S.C. § 1983 (1976) and tortious interference with contractual relations were dismissed. Also dismissed were all claims against the Board of Education of the City of New York ("School Board") and the individual defendants. The plaintiffs, Wickham Contracting Company ("Wickham") and Ralph Perone, cross appeal from those dismissals.

We reverse the judgment holding Local 3 liable for violating the Sherman Act and remand for a new trial. We affirm so much of the judgment as held Local 3 liable for violating the LMRA but reverse the damage award and remand for a new trial on damages. We affirm the cross appeal.

We note that we have been severely hampered in untangling and resolving the issues in this case by the failure of counsel to file with the court a supplemental appendix relied upon heavily in the briefs and by the failure to comply with F.R.App.P. 30 by not including highly important parts of the record in the appendices. These included the complaint, relevant testimony, and portions of the district court's charge.

## BACKGROUND

The factual circumstances surrounding this case were previously litigated and decided by the National Labor Relations Board ("NLRB") in two unfair labor practice actions and by this court in an enforcement proceeding. In *Local 3, International Brotherhood of Electrical Workers, AFL–CIO,* 220 N.L.R.B. 249 (1975), the NLRB adopted Administrative Law Judge ("ALJ") Schlezinger's findings that Local 3 "restrained and coerced" Wickham in the selection of collective bargaining representatives in violation of section 8(b)(1)(B) of the Act.

* The Honorable Charles M. Metzner, United States District Judge for the Southern District of New York, sitting by designation.

29 U.S.C. § 158(b)(1)(B) (1976).[1] In *Local 3, International Brotherhood of Electrical Workers, AFL–CIO*, 220 N.L.R.B. 785 (1975), the NLRB adopted ALJ Plaine's findings that Local 3 induced many of its members employed by electrical contractors to walk off School Board jobs in an effort to force the School Board to cease doing business with plaintiffs in violation of section 8(b)(4)(B)'s prohibition of secondary boycotts.[2] We granted enforcement of the resulting orders. *N.L.R.B. v. Local 3, International Brotherhood of Electrical Workers*, 542 F.2d 860 (2d Cir.1976).

The facts found by both ALJs were essentially as follows. Local 3 represents electricians who are employed by contractors to perform construction work. Wickham and Ralph Perone formed a joint venture ("Wickham-Perone") to do electrical work on construction contracts in New York City as permitted by Perone's electrical license. Perone is a party to a collective bargaining agreement with the Teamsters. Wickham is a member of the United Construction Contractors Association ("Association"), a multi-employer group which also bargains with the Teamsters. During 1974, Wickham-Perone was engaged as an electrical subcontractor on a number of School Board construction projects.

Beginning the week of July 8, 1974, between 200 and 300 members of Local 3 employed by electrical subcontractors working on School Board jobs walked out. The walkout lasted for two months until stopped by a temporary restraining order. Its objective "was to pressure the Board of Education, through pressure on its contractors, to cease doing business with electrical contractors whose employees were not Local 3 members, in particular contractors Wickham and Perone ... whose electricians were Teamster Local 363 members."

The walkout brought School Board projects to a virtual halt. Electrical work is generally done at an early stage and, until completed, other construction work cannot go ahead. On July 19, School Board Director Hugh McLaren met with Local 3's Business Manager Thomas Van Arsdale, who expressed concern over the job security of Local 3 electricians and demanded that only members of Local 3 should be hired to work on School Board projects. Van Arsdale expressly referred to Wickham-Perone and stated that it was not paying the prevailing wage rate. McLaren said that he would do all he could to see that Local 3 contractors were not unfairly bid against but that he could not guarantee jobs since contracts were awarded on the basis of competitive bidding.

Faced with the need to complete the construction projects before September school openings, however, the School Board decided to dismiss non-Local 3 contractors from School Board work. On July 19, 1974, letters were sent to Wickham-Perone and oth-

---

1. Section 8(b)(1)(B) reads as follows:
   (b) It shall be an unfair labor practice for a labor organization or its agents—
   (1) to restrain or coerce ... (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances...
   29 U.S.C. § 158(b)(1)(B).
2. Section 8(b)(4)(B) reads as follows:
   (b) It shall be an unfair labor practice for a labor organization or its agents—
   (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or re-

strain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
   (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.
   29 U.S.C. § 158(b)(4)(B).

er non-Local 3 contractors ordering them to stop work until such time as they could provide employees who would not cause stoppages.

Following receipt of the letter, Wickham's President Biele phoned McLaren for an explanation. McLaren at first said that Wickham was not paying the prevailing wage (a false charge in light of a City Controller's investigation) but later explained that Wickham's presence was causing work stoppages by Local 3 members. When Biele asked what he could do to alleviate the problem, McLaren answered that work could be resumed if Wickham's employees joined Local 3.

On July 25, the School Board asked Van Arsdale to return Local 3 to work. Van Arsdale equivocated, saying that he would look into it but that he wanted a meeting with McLaren's supervisor, School Vice Chancellor Dr. Bernard Gifford. The meeting occurred that very afternoon. At the meeting, Van Arsdale again complained that Local 3 was not receiving all of the School Board's work. Gifford asked what Van Arsdale wished the School Board to do, but Van Arsdale said nothing. Gifford requested a written proposal, which Van Arsdale promised but never delivered.

A second meeting occurred on August 20, while the Local 3 stoppage continued. The participants at this meeting included Deputy Mayor Cavanaugh, School Chancellor Anker, Deputy Corporation Counsel Buxbaum, School Board President James Regan, and several School Board members. Van Arsdale, McLaren and Gifford were also present. Van Arsdale expressed concern about Local 3's job security and proposed a so-called "layoff" plan under which electrical workers for contractors on public projects would be put on a list once their work was completed and the contracts had expired. When new public projects arose, the contractors for those projects would be required to hire from the layoff list in the order of layoff seniority. The list, according to Van Arsdale, would include both Local 3 and non-Local 3 electricians. However, it was obvious that the list would

consist predominantly of Local 3 electricians since they comprised the bulk of the labor force. For their part, city officials expressed doubts about both the legality and efficiency of the Van Arsdale proposal.

The Local 3 work stoppage continued until September 13, when the district court issued a temporary restraining order. In the meantime, Local 3's Business Representative Bernard Rosenberg made direct appeals to Wickham officials to convince them to switch Wickham's union recognition. In late spring, Rosenberg had visited Wickham's offices and argued that Local 3 could provide Wickham with qualified men. In July, after Wickham-Perone had received its notice from McLaren, Rosenberg met alone with Biele and told Biele that Local 3 could provide electricians to complete Wickham's School Board work, thus ending the effective boycott against Wickham. In September, after employees of Association members voted in an NLRB election to continue to be represented by the Teamsters, Local 3 set up pickets outside Wickham's Pelham office with signs stating that Wickham employees were on strike. In October, Van Arsdale met with Biele and requested that Wickham quit the Association and undertake a new election in which Wickham's employees would choose Local 3. Van Arsdale's basis for this demand was that some Wickham employees had already left the Teamsters for Local 3. Biele, however, said that only a few of his employees had affiliated with Local 3 and no agreement was reached. In fact, only three Wickham employees had left for Local 3 contractors. However, twelve Perone employees had also left for such contractors, thus raising the joint venture's loss to fifteen men. Further picketing by Local 3 occurred in early December at Wickham's Downstate Medical Center jobsite and at Wickham-Perone's Kings County Hospital jobsite.

Local 3's appeals to Wickham and the picketing of its offices and jobsites and of joint venture jobsites were held by ALJ Schlezinger to constitute unlawful coercion in the choice of a bargaining representative

in violation of section 8(b)(1)(B). As to the section 8(b)(4)(B) charge, Local 3 contended that its actions were part of a primary dispute with the School Board, the centerpiece of which was conflict over Van Arsdale's layoff plan. However, ALJ Plaine found that the layoff plan was a facade designed to conceal Local 3's real goal of monopolizing School Board work. He characterized the plan as an "afterthought" proposed more than a month after Local 3's strike had begun. More importantly, he noted that Local 3 did not have a primary relationship with the School Board since the Board itself did not hire electricians. He held that the work stoppage which caused the School Board's suspension of Wickham violated section 8(b)(4)(B). The Board affirmed the ALJs' decisions and we ordered enforcement.

Judge Broderick read much of the ALJs' findings of fact and conclusions of law to the jury. He instructed the jury that these findings and conclusions had been previously litigated and were binding upon it in the present case. Evidence introduced at trial detailed other problems encountered by Wickham and the joint venture. There was testimony as to beatings of Ralph Perone, vandalism on joint venture projects other than School Board work, vandalism on Wickham projects, probable arson at Wickham's offices, and threats of violence against Wickham officials and foremen. However, the plaintiffs were unable to prove that Local 3 was responsible for these acts. The joint venture collapsed in late 1975, after it was excluded from bidding on City jobs for apparently arbitrary reasons. Again, however, no link to activities of Local 3 was proven.

Evidence introduced to prove damages detailed delays in completing the renewed School Board work because of the joint venture's loss of fifteen men and the need to do the work in a "piecemeal" fashion because the schools had opened. Jordan Fishbane, a certified public accountant outlined the ebb and flow of Wickham's profits (50% of which were derived from the joint venture) and estimated that, had Wickham's historic rate of growth been maintained in the years subsequent to 1974, it would have earned profits of $560,000, $840,000, and $1,260,000 in fiscal years 1975, 1976 and 1977, respectively. Wickham's actual profits declined from $251,000 in fiscal year 1974 to $88,000 in 1975, and then to a loss of $42,000 in 1976. In 1977, they rose to $272,000. His testimony did not attempt to differentiate between the many possible causes for the decline in profits, including economic conditions or the various problems encountered by Wickham which cannot be legally attributed to Local 3.

## THE PROCEEDINGS IN THE DISTRICT COURT

The complaint alleged six causes of action, two of which were heard as pendent state claims. It alleged that the School Board, along with the other defendants, had deprived them of their property without due process and had denied them equal protection of the laws by preventing them from bidding on School Board jobs in violation of their civil rights. It also alleged that the various defendants had violated the Sherman Act. Finally, it sought damages for the acts constituting unfair labor practices under section 303 of the LMRA, 29 U.S.C. § 187[3] for breach of contract by the

---

3. Section 303 reads as follows:

(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.

(b) Whoever shall be injured in his business or property by reason o[f] any violation of subsection (a) of this section may sue therefor in any district court of the United States

subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.

29 U.S.C. § 187.

To the extent that the complaint sought damages for the Section 8(b)(1)(B) violation under section 303, it should have been dismissed on the pleadings.

School Board and for tortious interference with contract by all defendants.

The jury found for the plaintiffs on the civil rights, antitrust, and section 303 claims. It found for the individual defendants, McClaren, Van Arsdale and Rosenberg on all claims and for Local 3 and the School Board on the remaining claims. The jury awarded $158,000 in compensatory damages and $20,000 in punitive damages for the civil rights violation, $158,000 for the antitrust violation, and $959,000 under section 303.

The defendants subsequently moved to set aside the verdict. That motion was granted as to the civil rights claim against the School Board. The motion to set aside the antitrust and secondary boycott verdict was denied. The antitrust award was trebled and, with $15,000 in attorney's fees, added to the award under section 303.

## DISCUSSION

Local 3 argues that attributing a collateral estoppel effect to the unfair labor practice judgments was improper, the antitrust verdict is contrary to law, and that the damages awarded under section 303 are excessive. Although the notice of cross appeal is general enough to include the dismissal of the civil rights claim, the pendent state claims and the claims against the individual defendants, the cross-appellants have not briefed the issues and we deem them waived.

1. *Collateral Estoppel in the Section 303 Action*

We turn first to the collateral estoppel issue. It is now settled that administrative proceedings can have a preclusive effect in the form of either *res judicata* or collateral estoppel. As the Supreme Court has noted:

> When an administrative agency is acting in a judicial capacity and resolved disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose.

*United States v. Utah Construction Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966). Following this general rule, a number of circuits have held that prior N.L.R.B. unfair labor practice determinations can be binding as to fact and law under the doctrine of collateral estoppel in subsequent section 303 damage actions. *See, e.g., Consolidated Express, Inc. v. New York Shipping Association, Inc.,* 602 F.2d 494 (3d Cir. 1979), *vacated on other grounds,* 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980), *International Wire v. Local 38, International Brotherhood of Electrical Workers,* 475 F.2d 1078 (6th Cir.1973), *cert. denied,* 414 U.S. 867, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973), *Texaco, Inc. v. Operative Plasterers & Cement Masons,* 472 F.2d 594 (5th Cir.1973), *cert. denied,* 414 U.S. 1091, 94 S.Ct. 721, 38 L.Ed.2d 548 (1973). While a prior decision of this court suggests otherwise, *Old Dutch Farms, Inc. v. Milk Drivers & Dairy Employees Union,* 359 F.2d 598 (2d Cir.1966), *cert. denied,* 385 U.S. 832, 87 S.Ct. 71, 17 L.Ed.2d 67 (1966), that decision was rendered before *Utah Construction,* which, we believe, is fully applicable here.

The legal and factual issues in the administrative and judicial proceedings are, but for damages, absolutely identical since section 303 authorizes damage actions for violations of section 8(b)(4), the very issue of liability adjudicated by the Board. So long as particularized unfairness is not demonstrated, we perceive no reason to allow a union or employer who has lost an 8(b)(4) unfair labor practice proceeding before the Board to relitigate issues relating to liability. Since there is no reason to believe that legal results in section 303 actions will be superior to those arrived at in the administrative proceedings, or that inconsistent results before the different tribunals will increase procedural or substantive fairness, the judicial and other resources consumed in relitigating such issues is pure waste.

Local 3's sole claim of unfairness is that newly discovered evidence shows the School Board used a plan similar to the Van Arsdale "layoff" plan in connection with

other contracts. The union argues that such evidence tends to prove that the walkout was motivated by a primary dispute with the School Board and that, because the lack of discovery in NLRB proceedings prevented it from learning of these other contracts, it should now be permitted to relitigate the issue. While we do not disagree that the unavailability of prehearing discovery in NLRB proceedings might allow relitigation of a factual issue where relevant evidence is later discovered, *see Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 330–31, 99 S.Ct. 645, 651–652, 58 L.Ed.2d 552 (1979), the evidence described here does not undercut the ALJ's finding. The ALJ specifically concluded that the "layoff" plan was an "afterthought" proposed well after the walkout and that Local 3 could not in any event have a primary relationship with the School Board. The proffered evidence thus could not have affected the outcome before the ALJ. The judgment of liability under section 303 must thus be affirmed.

2. *Collateral Estoppel as to the Antitrust Claim*

■ For similar reasons, the relitigation of issues adjudicated by the NLRB is precluded in the antitrust action by the doctrine of collateral estoppel to the extent that the issues are identical and their resolution was essential to the NLRB's decision. *RX Data Corp. v. Department of Social Services,* 684 F.2d 192, 197 (2d Cir.1982).

Local 3 argues that because the legal standard for determining a labor organization's responsibility for the acts of individuals differs between the section 303 action, 29 U.S.C. §§ 185, 187 ("whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling") and the antitrust action, 29 U.S.C. § 106 (1976) ("clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof"), the ALJs' findings may not have a preclusive effect in the antitrust action. However, Judge Broderick instructed the jury that Local 3 might not be held liable in antitrust absent "clear

proof" of authorization or participation. This instruction separated the issue of mixed fact and law as to union responsibility from issues of adjudicative facts such as which individuals did or said certain things. It thus properly limited the preclusive effect of collateral estoppel to the latter issues.

However, the jury was improperly instructed as to the binding effect of the ALJs' findings on one critical matter. Plaintiffs' antitrust claim is based on the decision in *Connell Construction Co., Inc. v. Plumbers and Steamfitters Local Union No. 100,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), which held that a union may be subjected to antitrust liability for demanding that a general contractor withhold business from any subcontractors who did not employ members of the union. As described by the Court, the gravamen of the restraint on trade was that:

> The agreements with general contractors did not simply prohibit subcontracting to any nonunion firm; they prohibited subcontracting to any firm that did not have a contract with Local 100. The union thus had complete control over subcontract work offered by general contractors that had signed these agreements. Such control could result in significant adverse effects on the market and on consumers—effects unrelated to the union's legitimate goals of organizing workers and standardizing working conditions. For example, if the union thought the interests of its members would be served by having fewer subcontractors competing for the available work, it could refuse to sign collective-bargaining agreements with marginal firms. Or, since Local 100 has a well-defined geographical jurisdiction, it could exclude "traveling" subcontractors by refusing to deal with them. Local 100 thus might create a geographical enclave for local contractors....

*Id.* at 624–25, 95 S.Ct. at 1836 (citation omitted).

To prevail on a *Connell* theory, plaintiffs had to prove that Local 3 demanded that School Board work be contracted exclusive-

ly to firms which used Local 3 electricians. Were it to prove that Local 3 attempted to exclude only Wickham-Perone, the necessary restraint of trade would not have been demonstrated. However, whether Local 3's actions were directed at all such firms or just at Wickham-Perone was irrelevant in the proceedings before the ALJs since secondary boycotts and coercion as to recognition of a bargaining representative are illegal whether directed at one or many employers. While the ALJ did find that Local 3 sought to exclude all subcontractors who did not hire members of Local 3, a narrower finding would have sufficed.

■ Collateral estoppel precludes relitigation of an issue only if the prior determination of that issue was "necessary and essential to the judgment in [the earlier] action." *RX Data Corp. v. Department of Social Services,* 684 F.2d at 197. This limitation is necessary in the name of procedural fairness, if not due process itself, so that parties to litigation have sufficient notice and incentive to litigate matters in earlier proceedings which may bind them in subsequent matters. In the present case, the ALJs' factual determinations that Local 3 sought to exclude all non-Local 3 subcontractors, not just the joint venture, while critical to the antitrust claim, was neither necessary nor essential to the unfair labor practice findings and Local 3 had no reason to litigate that precise issue. Nevertheless, the jury was instructed explicitly that such factual determinations were binding on it. We must, therefore, reverse the antitrust verdict and remand for a new trial.

■ Local 3 argues that the antitrust claim should be dismissed because plaintiffs failed to show a conspiracy between Local 3 and non-labor parties to restrain competition. However, proof of such a conspiracy is unnecessary to make out a violation of Section 2 of the Sherman Act under *Connell. Connell* itself involved no evidence of any conspiracy between the defendant union and non-labor groups, as the Court explicitly pointed out. 421 U.S. at 625, n. 2, 95 S.Ct. at 1836, n. 2. The gravamen of the antitrust violation was the union's forcing of Connell into the offending agreement, not a conspiracy with non-labor groups to injure Connell. Plaintiffs here have alleged a Section 2 violation and should be allowed to proceed on that theory upon retrial.

### 3. *The Section 303 Damage Award*

■ The damage award under section 303 also cannot be sustained. Although the gravamen of both the secondary boycott and antitrust claims is Local 3's pressure on the School Board to cease doing business with the joint venture, the jury awarded $959,000 in damages on the former and $158,000 on the latter. The district court added the awards after trebling that antitrust award. Since damages are sought for the same illegal acts under different legal theories, the verdicts should be identical and a single recovery allowed, albeit the antitrust award must be trebled. In the present case, error was compounded in that inconsistent damage awards were made by the jury and then added together by the court.

■ Moreover, the $959,000 award under section 303 simply has no basis in the record. Of the many acts which might have caused lost profits—the School Board's two month suspension of Wickham-Perone, picketing of the joint venture and Wickham at non-School Board jobsites, vandalism, threats of violence, arson against Wickham, the beatings of Perone and the arbitrary refusal of the City to allow the joint venture to bid on jobs—only the School Board's two month suspension of the joint venture provided a basis for recovery under section 303. Judge Broderick so instructed the jury and we can only speculate, as he did in a post-trial hearing, that the jury misunderstood those instructions and awarded damages for both the section 8(b)(4) and 8(b)(1)(B) unfair labor practices. The evidence on damages was largely undifferentiated as to the various possible causes but we can say with confidence that on the present record, a reasonable person could not attribute $959,000 in lost profits to the School Board's two month suspension of the joint venture in 1974, since even Fishbane indicated that the bulk of lost profits came in later years and after plaintiffs had suf-

fered numerous other tribulations. Defendants are entitled to a new trial on damages under section 303.

## CONCLUSION

We affirm the various dismissals of claims against the defendants. We affirm the judgment insofar as it held Local 3 liable for a violation of section 303 but reverse the damage award and remand for retrial on that issue. We reverse so much of the judgment as held Local 3 liable for violations of the Sherman Act and remand for retrial for the reasons stated.

OAKES, Circuit Judge (concurring and dissenting):

I concur in all of the court's opinion except that portion relating to the Sherman Act claim. Under *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), the union's antitrust immunity depends, inter alia, on whether its concededly legal goal of "organizing as many subcontractors as possible," *id.* at 625, 95 S.Ct. at 1836 (footnote omitted), was pursued by illegal means, because the "methods the union chose are not immune from antitrust sanctions simply because the goal is legal." *Id. Connell* involved an agreement exacted by a union from a nonlabor party that had the effect of restraining competition. The Court held that such a "direct restraint on the business market .... contravenes antitrust policies to a degree not justified by congressional labor policy, and therefore cannot claim a nonstatutory exemption from the antitrust laws." *Id.* at 625, 95 S.Ct. at 1836.

Although this case involves tactics allegedly directed at the same result sought in *Connell,* i.e., forcing a general contractor to employ only subcontractors who employed the defendant union's employees, an essential element of liability under section 1 of the Sherman Act is concerted action. *See United States v. Hutcheson,* 312 U.S. 219, 232, 61 S.Ct. 463, 466, 85 L.Ed. 788 (1941) ("So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and illicit ... are not to be distinguished by any judgment re-

garding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means.") (footnote omitted); *Jou-Jou Designs, Inc. v. International Ladies Garment Workers Union,* 643 F.2d 905, 910 (2d Cir.1981). Because this case was submitted to the jury under section 1 of the Sherman Act, proof of a "contract, combination ... or conspiracy" was essential. In my opinion the evidence here was insufficient to support a finding of concerted action. The trial judge, at the close of trial and prior to charging the jury, stated that he did not "see in this whole case a scintilla of evidence from which it could be inferred that there was any conspiracy to fire Wickham-Perone." Tr.Tran. at 1985. After reviewing the record I am inclined to agree with this observation. The stop orders were issued pursuant to a contract clause the School Board interpreted as allowing the suspension of contractors causing or associated with labor troubles; the stop orders were rescinded when the City's Corporation Counsel informed the Board that its interpretation of the contract was erroneous. Thus it seems to me that the Board's conduct in this case was unilateral, notwithstanding that it might have been precipitated by the actions of Local 3. Conspiracy requires more than a cause-and-effect relationship, and there simply was not enough evidence here to support the jury's finding that, as the trial court ultimately charged, "there was an agreement between the School Board, through McLaren [sic] ... and Local 3 ... unreasonably to restrain trade in the electrical industry by excluding Wickham-Perone from electrical work." In my view the School Board and McClaren were properly dismissed as defendants and with that dismissal Wickham's antitrust claim under § 1 evaporated. The verdict as to antitrust liability should therefore be reversed rather than remanded.

On an alternative basis, I also believe that reversal is warranted because there was no showing here as to the "challenged restraint's overall impact on competitive conditions [as opposed to evidence showing that] a particular party has been restrained

**30**

by the conduct at issue." *Berman Enterprises, Inc. v. Local 333,* 644 F.2d 930, 937 (2d Cir.1981), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 381 (1981). Although *Connell* makes it clear that a direct restraint on the "business market" states a colorable antitrust claim, whether a particular restraint violates the rule of reason turns on "the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." *National Society of Professional Engineers v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). The jury charge, however, offered no guidance as to what factors might be considered in determining whether the restraint alleged here was "unreasonable." Instead, the jury was told that in order to find liability it need only find a conspiracy, an act in furtherance of the conspiracy, and injury to "the *plaintiff* . . . as a proximate result of that conspiracy." (Emphasis added.) But the Sherman Act is directed primarily at injury to competition, not injury to competitors; the rule of reason requires the factfinder to focus on injury to competition. While I have no doubt that restraints of the sort at issue here may have the general effect of restraining competition, that is not what the jury found or had evidence to find in this case.