**LONE STAR STEEL COMPANY, Plaintiff,**

v.

**UNITED MINE WORKERS OF AMERICA, and its Local Union No. 9313, Defendants.**

**Nos. 75-92-C, 79-36-C.**

United States District Court, E.D. Oklahoma.

Feb. 21, 1986.

**1282**

Lynn Mattson and Michael K. Huggins, Tulsa, Okl., for plaintiff.

Michael Holland, Maynard I. Ungerman, Tulsa, Okl., Earl Brown, Jr., A. Randal Vehar and Harrison Combs, United Mine Workers of America, Washington, D.C., for defendants.

## ORDER

H. DALE COOK, Chief Judge.

Now before the Court for disposition on issues of liability are the consolidated cases, Nos. 75–92–C and 79–36–C, brought by plaintiff, Lone Star Steel Company, against defendants, the United Mine Workers of America and Local 9313 of the United Mine Workers of America.

In Number 75–92–C, Lone Star seeks damages pursuant to § 303 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 187 (1982). Lone Star alleges that the defendants, contrary to §§ 8(b)(4)(i), (ii)(A) of the National Labor Relations Act ("the Act") (as amended, 29 U.S.C. § 158(b)(4)(i), (ii)(A) (1982)), induced Lone Star's employees to engage in a strike with an object of forcing Lone Star to agree to certain provisions of the 1974 National Bituminous Coal Wage Agreement which allegedly violate § 8(e) of the Act (29 U.S.C. § 158(e) (1982)).

In Number 79–36–C, Lone Star seeks treble damages pursuant to the Sherman and Clayton Antitrust Acts, as amended, 15 U.S.C. §§ 1, et seq. (1982). Lone Star contends that the defendants' conduct in inducing a strike to obtain allegedly illegal collective bargaining provisions constitutes a *per se* violation of the antitrust laws.

The defendants assert that the work stoppage engaged in by Lone Star's employees was at all times a lawful, economic, unfair labor practice strike which was not motivated by illegal objectives. Defendants further assert that, as labor organizations, they are immune from antitrust liability under the statutory labor exemption to the antitrust laws, 15 U.S.C. § 6 (1982).

An evidentiary hearing on this matter was held before this Court on March 13, 1984. In addition to the testimony adduced in that hearing, the parties have submitted for the Court's consideration transcripts of testimony taken in parallel proceedings before the Honorable Joseph W. Morris in *Youngblood v. UMWA*, Nos. 75–71–C and 75–72–C (E.D.Okla. April 11, 1975), and before a National Labor Relations Board Administrative Law Judge in *The Matter of United Mine Workers of America, Respondent, and Surface Industries, Inc. and Lone Star Steel Company, Charging Parties*, Nos. 16–CB–924, 16–CC–517, 16–CC–518 (October 21, 1975).

After considering the pleadings, the testimony and exhibits admitted at the evidentiary hearing, the submitted records of parallel proceedings, all of the briefs and arguments presented by counsel for the parties, and being fully advised in the premises, the Court enters the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. These consolidated cases arise in their entirety under federal law, 29 U.S.C. § 187; 15 U.S.C. § 1 *et seq.* (1982). Jurisdiction over the subject matter is appropriately vested in this Court pursuant to 28 U.S.C. §§ 1331, 1337 (1982).

2. The plaintiff, Lone Star Steel Company (Lone Star), is a Texas-based manufacturer of steel products. When these cases arose, Lone Star's principal product was steel pipe for use in the oil and gas industry. In connection with its business, Lone Star used 36,000 to 40,000 tons of coal per month to produce coke, which in turn was used in the steel-making process. Lone Star obtained its coal both from outside suppliers and from coal lands owned or leased by it.

3. In early 1972, Lone Star acquired the coal-producing property known as the Starlight Mine, located near McCurtain, Oklahoma. From the time of Lone Star's acquisition of Starlight until April 1, 1973, the mine was operated under subcontract by the River Corporation. On April 1, 1973, Lone Star assumed operational capacity over the mine.

4. The defendant, the United Mine Workers of America (the Union), is a labor organization which represents underground and surface coal miners throughout the United States and Canada.

5. The defendant, Local 9313 of the United Mine Workers of America (the Local), is a local affiliate of the United Mine Workers of America which at all times pertinent herein was the recognized collective bargaining representative for a unit of Lone Star's employees at the Starlight Mine.

6. One of the Union's primary functions is to periodically negotiate collective bargaining agreements on behalf of its members regarding wages, hours, and other terms and conditions of employment.

7. For many years the Union has engaged in collective bargaining with a multi-employer bargaining group, the Bituminous Coal Operators Association (the BCOA). The collective bargaining agreements negotiated between the Union and the BCOA are known as National Bituminous Coal Wage Agreements (NBCWAs), and are referred to individually by the year a particular agreement was entered.

8. Lone Star, at all times relevant to the events giving rise to these cases, was not a member of the BCOA.

9. The River Corporation, Lone Star's predecessor at the Starlight Mine, was a signatory to the 1971 NBCWA. Although some terms in the 1971 NBCWA were changed by addendum, Lone Star adopted the agreement when it began operating the Starlight Mine in April of 1973.

10. The expiration date of the 1971 NBCWA was November 12, 1974. In anticipation of this date, the Union notified Lone Star by letter of September 9, 1974, that it wished to negotiate a new agreement with the BCOA. The Union requested Lone Star to sign a letter of intent to be bound by the new agreement that would be reached with the BCOA.

11. In a letter dated September 30, 1974, Lone Star, through Howard Jensen, its Vice President and General Counsel, declined the Union's request to agree in advance to the national agreement. However, Jensen did state that Lone Star was willing to meet and bargain with the Union on an individual basis.

12. On November 4, 1974, the Union sent Lone Star a gray-bound volume of proposals for a new collective bargaining agreement (the Gray Book). Since the 1971 NBCWA was due to expire on the twelfth, the Union asked Lone Star to respond to the proposals by the eighth of November.

13. Lone Star did not respond to the proposals contained in the Gray Book. No further communication took place between the parties until mid-December, 1974.

14. The Union and the BCOA failed to come to terms on a new national agreement by the November 12, 1974, expiration date of the 1971 NBCWA. A national coal miners strike began on November 12, 1974. Lone Star's Union employees at the Starlight Mine (the members of Local 9313) joined their national brethren in the walk out.

15. On December 5, 1974, the Union reached accord with the BCOA on a new national agreement (the 1974 NBCWA). Lone Star was not a signatory to the new agreement, and its employees, still without a contract, remained on strike.

16. The first negotiation session between Lone Star and the Union took place at Union headquarters in Washington, D.C. on December 13, 1974. Lone Star's objections to certain provisions contained in the 1974 NBCWA constituted the focal points of discussion.

Howard Jensen, negotiating on behalf of Lone Star, voiced Lone Star's opposition to the cost-of-living wage escalators embodied in the national agreement. He further stated that Lone Star had "very serious reservations about the 'Successorship'

Clause,[1] and the 'Accretion' Clause" [2] (hereafter referred to as the "Coal Lands clause"). JCT 14–16; JBT 24–25. In addition, Jensen indicated that he had "difficulties accepting the language of the contract" with respect to the provision requiring Lone Star to make royalty payments to Union trust funds on purchases of non-Union coal [3] (hereafter referred to as the "Royalty clause"). Finally, Jensen expressed Lone Star's desire to implement a contract termination clause which would require the Union to bargain with Lone Star over the terms of a new collective bargaining agreement prior to the expiration of the present agreement. JCT 14–16.

In response to Lone Star's objection to the Coal Lands clause, Richard Bank, the Union's representative, explained the Union's interpretation of the clause in the following manner: "this is a provision which states that should the UMWA after signing an employee up at a specific mine site such as Starlight subsequently be recognized as a bargaining agent by the Employer or be certified by the NLRB both in compliance with the Act, then the Company would agree to honor the UMWA national contract in force at Starlight." BBT 601–23. The basis of Jensen's objection to the clause was that he understood it as imposing an illegal obligation on Lone Star to apply the contract entered into with the miners at Starlight to all other coal lands owned by Lone Star or its affiliates, regardless of whether the Union was the recognized bargaining agent of the employees working on those lands. Bank clarified the Union's interpretation of the clause many times during the course of the meeting in an effort to dispel Jensen's incorrect understanding of it. Bank advised Jensen that he had obtained opinions from the Union's general counsel which informed him that the clause could only be legally enforcible if it was understood to mean that, prior to its operation, the Union must first become the recognized bargaining representative of the employees on the signatory's (or its affilitates') properties. BBT 601–23.

17. After the meeting of December 13, 1974, ended without resolution of the parties' differences, Jensen and Bank exchanged correspondence through which a substitute cost-of-living wage escalator provision was agreed to.

18. By letter dated December 19, 1974, Lone Star explicitly set forth its continuing objections to the 1974 NBCWA.

As we told you before, we have very serious reservations concerning the successorship clause in Article I, and Sections (f) [the Coal Lands Clause] and (g) [the Contracting and Subcontracting

---

1. Although the "Successorship" Clause is repeatedly referred to in this order, its status as a legal and mandatory subject of collective bargaining has already been conclusively established by the Tenth Circuit. *See, Lone Star Steel Co. v. N.L.R.B.*, 639 F.2d 545 (10th Cir.1980), *cert. denied*, 450 U.S. 911, 101 S.Ct. 1349, 67 L.Ed.2d 335 (1981). Therefore, the parties have stipulated that the clause is no longer at issue in this litigation. However, in light of its duty to determine the provisions in the 1974 NBCWA through which the Union, by strike or coercion, sought to "forc[e] or requir[e]" Lone Star's accession, the Court finds it necessary to recount the content of the parties' meetings and letters. The persistent referrals to the clause as a point in controversy throughout the negotiations evidences its primacy in the dispute.

2. The provision of the 1974 NBCWA referred to as the Coal Lands clause is Article II, Section (f) "Application of This Contract to the Employer's Coal Lands," it reads as follows:

As part of the consideration for this Agreement, the Employers agree that this Agreement covers the operation of all coal lands, coal producing and coal preparation facilities owned or held under lease by them, or any of them, or by any subsidiary or affiliate at the date of this Agreement, or acquired during its term which may hereafter (during the term of this Agreement) be put into production or use.

3. The Royalty payments provision (Art. XX(d)) objected to by Jensen reads, *inter alia:*

In addition to the contributions indicated above, during the life of the Agreement, each signatory Employer shall, for the periods of time indicated below, contribute to the Trusts established in this Article in the amounts shown below based on cents per ton on each ton of two thousand (2,000) pounds of bituminous coal after production by another operator, procured or acquired by such Employer for use or for sale on which contributions to the appropriate Trusts as provided for in this Article have not been made ...:

\*　\*　\*　\*　\*　\*

Clause] of Article II. Furthermore, we object to the royalty and contributions provided in Article XX, section (d) on purchased coal.

\* \* \* \* \* \*

The reference to the Contracting and Subcontracting Clause was the first and last time Lone Star indicated an objection to that provision during the course of the negotiations.

19. The second in-person negotiation session was held on January 3, 1975. Jensen again expressed his view that the 1974 NBCWA was unacceptable to Lone Star, and, that the Union's insistence on the Successorship Clause and the Coal Lands Clause rendered the prospect of mutual agreement dismal.

20. In testimony before Judge Morris, Jensen stated that, as of the time of the January 3, 1975, meeting, "we were still in disagreement on the Successorship Clause, the Accretion [Coal Lands] Clause, the royalty on non-union coal, and on a termination clause." JCT 19–22.

21. During the course of the January 3, 1975, meeting, Lone Star proposed and the Union agreed to implement a sixty-day "truce" agreement whereby the Starlight miners would return to work while the parties continued their negotiations on the disputed clauses. Under the terms of the "truce," Lone Star adopted the 1974 NBCWA in its entirety with the sole exceptions of the Successorship and Coal Lands clauses. The parties compromised on the Royalty clause. The Union agreed it would not enforce the clause on purchases of non-Union coal that was subsequently processed at locations other than the Starlight Mine; Lone Star agreed to pay royalties on purchases of non-Union coal which it processed at Starlight. BBT 623–27. The Starlight miners ratified the interim agreement and returned to work on January 8, 1975.

22. At the third meeting between the parties held on January 20, 1975, Bank presented Jensen with a written draft of the Union's interpretation of the Coal Lands clause. The document clearly set forth the Union's position that it is "implic-

it" within the language of the clause "that the UMWA must first become the properly designated collective bargaining representative of the majority of employees at any Employer bituminous coal mine ... before Article II, Section (f) becomes [sic] into play. In other words, the UMWA must first be recognized by the Employer or certified by the National Labor Relations Board (NLRB) as the bargaining representative for such employees. Should this occur, the Employer would be required immediately to implement the terms and conditions of the Agreement at that mine." The written interpretation was signed by Arnold Miller, then President of the United Mine Workers of America. In his conversation with Jensen, Bank admitted that the Coal Lands clause was useful as an "attractive organizing tool," but also stated that the Union's purpose in demanding the Clause was to preclude Lone Star from developing Union mines where the terms and conditions of employment were significantly lower than those enjoyed by the employees at Starlight. The Union wanted to insure the preservation of work at Starlight by removing Lone Star's incentive to shift production to a mine at which the Union employees were paid less than the miners at Starlight. Notwithstanding the Union's written interpretation of the clause, Lone Star remained unwilling to yield on its previously asserted objection to its legality.

The parties also discussed their differences on the Royalty clause and on Lone Star's requested inclusion of a termination clause. The meeting concluded without agreement on either, the parties remained deadlocked.

23. The next meeting took place four days later on the 24th of January, 1975. Jensen presented Bank with Lone Star's proposal for a termination clause that would allow Lone Star a strike-free sixty-day negotiation period beginning on the expiration date of the new contract. The proposal was unacceptable to the Union. The dispute over the Successorship and Coal Lands clauses continued: Lone Star again insisted that both were illegal; the Union asserted

its belief in their validity. JBT 37–39. In the parallel unfair practice proceedings before an administrative law judge, Jensen testified, concerning this meeting, that "(he) kn(e)w that Mr. Bank was not agreeable to yielding in any way on the successorship and accretion clauses except as modified in the draft he had given me and I kn(e)w that Lone Star was not disposed to yield on its position." JBT 37–39. The meeting adjourned without hint of reconciliation.

24. By letter of February 18, 1975, the Union formally rejected Lone Star's proposed termination clause.

25. On February 25, 1975, the parties held their last meeting during the interim "truce" period. At the beginning of the session the Union tendered to Lone Star a draft letter signed by Arnold Miller which set forth a proposed compromise on the Royalty clause. The Union offered to limit the scope of the clause to purchases of non-Union coal that was subsequently processed or loaded at Lone Star facilities at which the Union was the collective bargaining representative of the employees. The draft also contained a proviso that the compromise interpretation of the clause would not empower Lone Star to procure non-Union coal in substitution for coal mined by Lone Star's Union employees. In effect, the Union's proposal was substantially identical to the temporary compromise on the reach of the clause which had been embodied in the interim "truce" agreement. Lone Star would be free to acquire needed additional coal from non-Union sources without incurring an obligation to pay royalties so long as the non-Union coal was not loaded or processed on coal property owned or leased by Lone Star which was under Union jurisdiction.

In spite of the Union's written proposal, the parties did not bargain over the Royalty clause at the February 25 meeting. Jensen admitted, in testimony before Judge Morris, that since the beginning of January, when the parties had agreed to the temporary compromise on the scope of the

clause, they had "never got down to talking, doing any hard bargaining as to what the parties might agree to about extending the interim agreement in a permanent agreement." Jensen further added that he did not believe there was "a hard disagreement" over the clause. JCT 24–28.

The focal points of dispute at the February 25th meeting were again the Successorship and Coal Lands clauses. In addition to restating Lone Star's position that the clauses were illegal, Jensen took further exception to the broad reach of the provisions. The Union admitted that the clauses would be enforcible against any company affiliated with Lone Star or its parent corporation. Jensen asserted that, in light of the sweeping ambit of the clauses, he would have to secure approval from Lone Star's corporate family prior to entering into an agreement on them. As the expiration date of the interim "truce" was drawing near, Jensen requested a fifteen day extension to give him sufficient time to confer with the other companies about the application of the disputed clauses. Bank, on behalf of the Union, agreed to push the Local for a seven-day extension. The Local, however, rejected the Union's recommended extension.

26. In the week that followed the February 25th meeting, the Union sent Lone Star various proposed addenda to the 1974 NBCWA. Specifically, the Union proposed to formally incorporate into the agreement the following changes: 1) the Union's interpretation of the Coal Lands clause (that it would only be applicable if and when the Union became the recognized collective bargaining representative of the employees working on other coal lands owned or operated by Lone Star or its affiliates); 2) the Union's agreement that Article II, Section (i) of the 1974 NBCWA (which limited the performance of construction work at Lone Star's coal mine related facilities to Union members) would not be applicable to the construction of coke ovens at the Starlight Mine;[4] 3) the previously agreed upon

4. At various points in the negotiations Lone Star expressed its concern that the "Construction

Work" provision in the 1974 NBCWA would limit its ability to build coke ovens at the Star-

change in the cost-of-living wage escalator provision; 4) a provision permitting Lone Star to choose its own life insurance carrier, subject to approval by the Trustees of the UMWA Health and Retirement Funds;[5] and 5) a termination clause which would grant Lone Star the right to commence negotiations on a successor agreement within a time period beginning thirty days prior to the expiration date of the present agreement.

27. Lone Star rejected the Union's written proposals by telegram of March 5, 1975. In setting forth its reasons, Lone Star referred to the Local's refusal to extend the "truce" agreement, which resulted in constraining Lone Star's ability to ascertain the impact of the Coal Lands clause and the "Leasing, Subleasing and Licensing Out of Coal Lands" provision on Lone Star's affiliated companies.[6] Lone Star also cited the Union's "adamant insistence" on the Successorship clause as justification for its rejection of the 1974 NBCWA.

28. The parties failed to resolve their disaccord by the expiration date of the interim "truce" agreement. When the "truce" expired on March 8, 1975, the Starlight miners resumed their strike against Lone Star.

29. In a hearing before Judge Morris held on April 11, 1975, Jensen testified that the only points of disagreement between Lone Star and the Union at the time the Starlight miners resumed the strike were the Successorship clause, the Coal Lands clause, the Royalty clause, the Termination clause, and the Construction clause with regard to the building of coke ovens at Starlight.

30. By telegram of March 10, 1975, Lone Star formally withdrew all of the counterproposals it had previously submitted to the Union during the course of the negotiations.

31. Two months later, on May 8, 1975, Lone Star sent the Union a letter which explicitly enumerated the particular provisions in the 1974 NBCWA that it then construed as "the major stumbling blocks that are barring a settlement." The provisions listed by Lone Star were: 1) the Successorship clause; 2) the Coal Lands clause; 3) the Royalty clause; and 4) the Termination clause.

32. On June 18, 1975, George A. Wilson, the Chairman of the Board of Lone Star, wrote a letter to Carl Albert, then Speaker of the U.S. House of Representatives, describing Lone Star's position in its controversy with the Union. The letter was written in response to a previous letter from Albert to Lone Star in which Albert had expressed his belief that the controversy involved labor disputes at mines other than Starlight. In his letter, Albert had suggested that Lone Star adopt the 1974 NBCWA, and in so doing reserve its rights to challenge the legality of the provisions in the agreement with which it disagreed. Responding to Albert's letter, Wilson first sought to correct Albert's "misconception" that the controversy with Lone Star extended to labor disputes at mines other than Starlight. Wilson noted that the other disputes referred to by Albert in his letter involved employers who were not controlled by or affiliated with Lone Star. Wilson wrote "... the dispute, as we view it, between Lone Star and the UMWA is solely at McCurtain." In response to Albert's suggestion that Lone Star adopt, with reservation, the 1974 NBCWA, Wilson stated that because Lone Star was convinced that certain provisions in the agreement were illegal, and it believed the onus should be on the Union to reexamine its

light Mine. The Union's proposed addendum was designed to allay Lone Star's worries on the matter. Lone Star now asserts that one of the Union's objectives in striking the Starlight Mine was to achieve the "Construction Work" provision.

5. Lone Star does not now assert that a disagreement over choice of insurance carriers was an object of the strike.

6. The passing reference to the "Leasing, Subleasing and Licensing Out of Coal Lands" clause in Lone Star's telegram was the only time during the course of the negotiations and appertaining correspondence that Lone Star voiced an objection to it. Lone Star now asserts that one of the Union's objectives in striking the Starlight Mine was to achieve the Clause.

position, rather than on Lone Star to acquiesce to the Union's demands. Wilson then set out the provisions in the national agreement he believed were dividing the parties:

The issues, boiled down, are the insistence of the UMWA that Lone Star agree that any future purchaser of the McCurtain mine adopt the UMWA agreement and Lone Star agree that all other mines, now owned or hereafter acquired by Lone Star or any affiliate company, adopt the UMWA agreement.

The provisions referred to by Wilson are the Successorship and Coal Lands clauses.

## Parallel Litigation

33. On March 5, 1975, Lone Star filed an unfair labor practice charge against the Union with the NLRB. In its charge Lone Star asserted that the Union violated its statutory duty to bargain in good faith by bargaining to impasse and then striking to obtain the Successorship clause and Coal Lands clause. Lone Star alleged that these clauses were non-mandatory subjects of collective bargaining. Lone Star also contended that the Successorship clause was an illegal "hot cargo" clause violative of § 8(e) of the Act.

34. After investigating the charge, the NLRB filed a petition for a temporary injunction against the Union pursuant to Section 10(l) of the National Labor Relations Act in the United States District Court for the Eastern District of Oklahoma. A hearing on the Board's petition was held before the Honorable Joseph W. Morris on April 11, 1975. On May 5, 1975, the court entered its decision granting a temporary injunction. The court found that the strike at Starlight was precipitated by the Union's insistence upon the Successorship clause, and that the Successorship clause was "most probably prohibited by Section 8(e) of the Act." The court's order did not specifically address the legal status of the Coal Lands Clause, nor any other provision in the 1974 NBCWA. *Youngblood v. UMWA*, No. 75–72–C (E.D.Okla. May 5, 1975).

35. The Regional Director of the NLRB subsequently issued an unfair labor practice complaint against the Union. The complaint alleged that the Union committed unfair labor practices by: 1) bargaining to impasse over a nonmandatory subject of bargaining (the Coal Lands clause) and over an illegal clause (the Successorship clause) in violation of the statutory obligation to bargain in good faith; 2) engaging in unlawful inducement and encouragement to compel agreement on an unlawful clause (the Successorship clause) in violation of Section 8(b)(4)(i), (ii)(A) of the NLRA; and 3) engaging in secondary boycott picketing in violation of Section 8(b)(4)(i) and (ii)(B) of the NLRA. The matter came on for hearing before an Administrative Law Judge on October 21, 1975.

36. On January 28, 1976, the ALJ issued his decision in the case, *The Matter of United Mine Workers of America, Respondent, and Surface Industries, Inc. and Lone Star Steel Company, Charging Parties*, Nos. 16–CB–924, 16–CC–517, 16–CC–518 (October 21, 1975). The ALJ found that the Successorship clause was a mandatory subject of collective bargaining and the Union's strike to achieve it was neither a violation of Section 8(b)(4)(i), (ii)(A) of the NLRA, nor a refusal to bargain in good faith. Secondly, the ALJ determined that the Coal Lands clause was a nonmandatory subject of collective bargaining which, under the NLRA, could not be the subject of a strike. The ALJ held that an object of the Union's strike at Starlight was to compel agreement to the Coal Lands clause— thereby establishing an unfair labor practice under Section 8(b)(3) of the Act (refusal to bargain in good faith). In dictum, the ALJ stated that the Coal Lands clause was not an illegal clause under Section 8(e) of the NLRA. The Regional Director had not asserted in his complaint that the clause was illegal. The finding that the clause was legal was not necessary to support the ALJ's ultimate conclusion that it was a nonmandatory subject of collective bargaining.

37. The Regional Director, Lone Star, and the Union filed exceptions to the decision of the ALJ. The matter came on for appeal

before the National Labor Relations Board. The Board issued its decision on August 24, 1977, affirming in part and reversing in part the order of the ALJ. *United Mine Workers of America*, 231 N.L.R.B. 573, 96 L.R.R.M. 1083 (1977). The Board affirmed the portion of the ALJ's findings that held that the Successorship Clause was a mandatory subject of collective bargaining and, thus, no adverse legal consequences could flow from the Union's insistence upon it. The Board reversed the ALJ's finding that the Coal Lands clause was a nonmandatory subject of collective bargaining. It viewed the clause as one which "serves to protect the jobs and work standards of bargaining unit employees at the Starlight mine by removing economic incentives which might otherwise encourage Lone Star to transfer such work to other mines under its control." Because the clause was directed at preserving the work of the Starlight miners, the Board determined that it constituted a mandatory subject of collective bargaining.

38. Lone Star appealed the Board's decision to the United States Court of Appeals for the Tenth Circuit claiming error in the Board's disposition on both the Successorship and Coal Lands clauses. *Lone Star Steel Co. v. N.L.R.B.*, 639 F.2d 545 (10th Cir.1980), *cert. denied*, 450 U.S. 911, 101 S.Ct. 1349, 67 L.Ed.2d 335 (1981). The court sustained the Board's finding that the Successorship clause was a legal, and mandatory subject of collective bargaining. *Id.* at 556. With regard to the Coal Lands clause, the court found that the Board mis-

applied the appropriate legal criteria in determining its status as a mandatory subject of collective bargaining. The court agreed with the earlier finding of the ALJ that the scope of the clause was unnecessarily broad, reaching well beyond the legitimate union goal of protecting the employees' work. Because the clause did not constitute "a direct frontal attack upon a problem thought to threaten the maintenance of the basic wage structure established by the collective-bargaining contract" and its implementation would not *perforce* "vitally affect the terms and conditions of employment or the job security of unit employees," the court deemed it a nonmandatory subject of collective bargaining. *Id.* at 558, (*quoting, Teamsters Union v. Oliver*, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959)). Although the court noted that the ALJ had found the clause lawful, (and thus enforceable had the parties voluntarily agreed to its inclusion), it declined to express an opinion on the finding. Id. at 559, n. 26.

### The Instant Litigation

39. The critical factual decision in this case lies in identifying the underlying Union objective(s) that motivated the strike at the Starlight Mine. The Court's analysis of the question must be guided by the statutory language of § 8(b)(4)(i), (ii)(A), which prohibits labor organizations from engaging in strikes (or intimidating tactics) when *an* object thereof is to force or require an employer to enter into an agreement prohibited by § 8(e).[7] *National La-*

---

7. Section 8(b)(4) provides in pertinent part:
   (b) It shall be an unfair labor practice for a labor organization or its agents—
      *   *   *   *   *
   (4)(i) to engage in, or to induce or encourage any individual employed by a person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry commerce, where in either case an object thereof is—
   (A) forcing or requiring any employer or self-employed person to join any labor orga-

nization or to enter into any agreement which is prohibited by subsection (e) of this section [29 U.S.C. § 158(e)];
      *   *   *   *   *
29 U.S.C. § 158(b)(4)(i), (ii)(A).
   Section 8(e) provides in pertinent part:
      It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void....

bor Relations Board v. Denver Building & Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951); Frito–Lay, Inc. v. Retail Clerks Union Local No. 7, 629 F.2d 653, 659 (10th Cir. 1980). A labor organization does not violate § 8(b)(4)(i), (ii)(A) if an employer freely and voluntarily agrees to implement a contractual provision prohibited by § 8(e). Connell Construction Co., Inc. v. Plumbers and Steamfitters Local Union No. 100, 421 U.S. 616, 650 n. 9, 95 S.Ct. 1830, 1848 n. 9, 44 L.Ed.2d 418 (1975) (Stewart, J. dissenting). Although § 8(e) makes it an unfair labor practice for an employer and a union to enter into an agreement to cease doing business with another person, there is no liability under § 303 [8] unless the labor organization also violates § 8(b)(4)(i), (ii)(A) in attempting to achieve the illegal provision. Id.; see also Feather v. United Mine Workers of America, 711 F.2d 530 (3rd Cir.1983); National Labor Relations Board v. Hotel and Restaurant Employees and Bartenders' Union Local 531, 623 F.2d 61, 65 n. 1 (9th Cir.1980). Because Lone Star's burden in this case is to prove that it has been the unwilling victim of Union pressure, designed, at least in part, to force its accession to an illegal § 8(e) agreement, the initial point of inquiry must be on the individual clauses of the 1974 NBCWA which were rejected by Lone Star, and which ultimately precipitated the strike at Lone Star's facilities.

40. Lone Star commenced this litigation on April 11, 1975. In March of 1976, the § 303 action herein asserted was placed in abeyance pending the final resolution of the parallel unfair labor practice proceedings before the Board and the Tenth Circuit. More than four years transpired before the Tenth Circuit ruled on the Successorship and Coal Lands clauses. The parties thereafter resumed briefing the § 303

issues. In 1984, nearly a decade after the initial events at Starlight, a formal evidentiary hearing was held before this Court in which the parties testified to what they then believed to be the causal factors of the strike.

41. The Court finds that the parties' testimony in the parallel proceedings which took place in 1975 before Judge Morris and the ALJ, and the pleadings and briefs submitted in this case most near in time to the beginning of the strike at Starlight, constitute the most probative evidence of the Union's objectives. As in most § 303 actions, liability in this case turns upon difficult factual and legal issues intimately bound up in questions of intent and motivation. Reason dictates that the most persuasive verification of the subject matter of the labor dispute and the inspiration underlying the subsequent strike is evidence of the parties' words and acts occurring at or about the time of the actual events at Starlight.

42. At the initial stages of this litigation Lone Star confined its claims to the Successorship and Coal Lands clauses. When this case was taken out of abeyance in 1980, Lone Star's position regarding the clauses that were at issue prior to the resumption of the strike in March, 1975, changed drastically from what it had been at the time the case was placed in abeyance. On June 27, 1980, Lone Star filed a motion for summary judgment on issues of liability in which it asserted, for the first time in this, or any other litigation, that the Union struck to achieve provisions in the 1974 NBCWA other than the Successorship and Coal Lands clauses. The Court observes that five years prior to the 1980 motion, Lone Star filed a predecessor motion for partial summary judgment on issues of liability in which it alleged the Successorship and Coal Lands clauses as the sole grounds

---

29 U.S.C. § 158(e).

**8.** Section 303 provides in pertinent part:
(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.

(b) Whoever shall be injured in his business or property by reason of any violation of subsection (a) of this section may sue therefore in any district court of the United States ..., and shall recover damages by sustained and the cost of the suit.
29 U.S.C. § 187.

for the Union's liability. Moreover, Lone Star, on page 17 of its 1975 brief (filed just three months after the resumption of the strike), distinguishes the Successorship and Coal Lands clauses from "other provisions in the agreement itself which specifically protect the work of primary employees," the brief then cites three clauses in the 1974 NBCWA which Lone Star, in its 1980 motion, alleged to be illegal Union objectives.[9] Again, on page 26 of the 1975 brief, while arguing the illegal, secondary nature of the Successorship and Coal Lands clauses, Lone Star adverted to the existence of "other work preservation language directed at the primary employer" specifically citing the three clauses which it now asserts as illegal Union objectives. Finally, the Court takes note of the decision of the Third Circuit in *Amax Coal Co. v. N.L.R.B.*, 614 F.2d 872 (3rd Cir.1980) in which that court decided that the identical three clauses of the 1974 NBCWA were illegal § 8(e) "hot cargo" provisions. The Third Circuit's decision in *Amax* was rendered in February, 1980—four months prior to the filing of the brief in which Lone Star first attributed the events at Starlight to the Union's insistence upon these clauses.

43. The Court finds that the plaintiff has not shown by a preponderance of the evidence that the Union engaged in, induced, or encouraged a strike among plaintiff's employees, or threatened, coerced, or restrained plaintiff with an object of forcing or requiring plaintiff to enter any agreement during the period beginning November 12, 1974 and ending December 13, 1974. The record is barren of evidence indicating a dispute between the parties during this period; the parties never met to address their differences until December 13, 1974. As noted above, liability under § 303 and § 8(b)(4)(i), (ii)(A) is predicated upon proof that a labor organization has utilized its economic weapons with an object of forcing or requiring the employer's accession to an illegal § 8(e) agreement. Lone Star has not proven that the Union attempted to force or require it to succumb to anything

during the initial stage of the strike. All it has proved is that a strike began on November 12, 1974. The evidence offered on the objects of the strike during this initial period is insufficient.

44. The Court finds that beginning December 13, 1974, and resuming March 8, 1975, an object of the strike at the Starlight Mine was to force Lone Star to agree to the Coal Lands clause, as modified by the Union's interpretation. The Court's finding is supported by overwhelming evidence in the record that the Coal Lands clause was a chronic and perpetual point of controversy between the parties from the onset of negotiations on December 13, 1974, and continuing throughout the strike. Lone Star's opposition to the clause was unaffected by the Union's oral and written statements concerning the implicit limitation that it would be applicable only when the Union became the recognized bargaining representative of the employees on other coal lands. Lone Star believed the clause was illegal in violation of § 8(e) because it extended the scope of the agreement, and Lone Star's obligation thereunder to coal-related properties distinct from the premises on which the contractee-bargaining unit was employed. Moreover, the obligations imposed by the clause were not confined to Lone Star, but rather ran to all companies affiliated with Lone Star that maintained bituminous coal related operations. In connection with the Coal Lands clause, Lone Star also objected to the Article I "Enabling clause" which provides, *inter alia*, that the 1974 NBCWA "covers all of the bituminous coal mines owned or operated by said first parties." To the extent that the above-quoted language comports with and reinforces the parallel language of the Coal Lands clause, the Court finds that the quoted section of the Enabling clause was also an object of the strike at Starlight.

45. The Court further finds that beginning December 13, 1974, and resuming March 8, 1975, an object of the strike at the

---

**9.** The clauses Lone Star referred to as primary, work preservation clauses are: 1) Article II, Section (g) "Contracting and Subcontracting";

2) Article II, Section (h) "Leasing, Subleasing and Licensing Out of Coal Lands"; and 3) Article II, Section (i) "Construction Work."

Starlight Mine was to force Lone Star to agree to pay royalties on purchases of non-union coal that was subsequently processed or loaded at Lone Star facilities where the Union was the collective bargaining representative. Lone Star's opposition to the Royalty clause is well-supported by the evidence, and seconds only the controversy over the Successorship and Coal Lands clauses. At the January 3, 1975, negotiation session, the Union agreed to limit the applicability of the clause for the duration of the "truce" to purchases of non-union coal that was subsequently processed at the Starlight Mine. Thereafter, in February 1975, the Union formally proposed an addendum to the national agreement that would limit the clause to purchases of non-union coal that was subsequently loaded or processed at Lone Star facilities where the Union was the employees' collective bargaining representative. Lone Star has not proven that the Union struck to obtain the Royalty clause under any interpretation other than the Union's proposed interpretation. In fact, when Lone Star notified the Union that it was withdrawing all of its counterproposals after the March 8, 1975, resumption of the strike (finding of fact # 30), the Union responded with a telegram stating that it would not retract the compromises it had previously offered Lone Star in the effort to secure a permanent agreement. Clearly, the Union intended to modify the scope of the clause to the extent stated above.

46. The Court rejects Lone Star's contention that the Article II, Section (h) "Leasing, Subleasing and Licensing Out of Coal Lands" provision was an object of the strike at Starlight. The only indication that Lone Star opposed this provision at the time of the strike appears as a passing reference in Lone Star's March 5, 1975, telegram setting forth its reasons for refusing the Union's proposed addenda to the national agreement. In light of all the evidence, the Court believes that the reference to the provision in the telegram denotes an objection ancillary to and dependent upon Lone Star's basic opposition to the Coal Lands clause. In the telegram Lone Star asserted that by virtue of the Local's

refusal to extend the "truce" agreement it did not have sufficient time to ascertain the applicability of the two clauses to companies affiliated with Lone Star. The "Leasing, Subleasing and Licensing Out of Coal Lands" provision, by its express terms, only applies to the "[T]he licensing out of coal mining operations on coal lands owned or held under lease or sublease *by any signatory....*" The only affect the leasing provision could have on companies affiliated with Lone Star arises from the language of the clause which provides that "[T]he Employers agree that they will not lease, sublease or license out any coal lands, ... where the purpose thereof is to avoid the application of this Agreement or any section, paragraph or clause thereof." Therefore, Lone Star's citation to the provision did not evince opposition to its substantive content, but rather to the language which would prevent Lone Star from circumventing the mandate of the Coal Lands clause. The Court notes that none of the various letters in which Lone Star enumerated the clauses in dispute made mention of the provision. Moreover, the transcripts of the proceedings before Judge Morris and the ALJ contain no evidence showing that the leasing provision was ever discussed, much less disagreed upon, in any of the negotiation sessions. Finally, as noted above, Lone Star cited this provision in its early brief to this Court as a primary, work preservation clause to distinguish it from the alleged secondary, work acquisitive nature of the Successorship and Coal Lands clause. The weight of the evidence clearly militates against Lone Star's belated contention that the provision was in dispute at the time of the strike.

47. The Court finds that the Union did not strike to force Lone Star to agree to the "Construction Work" clause (Article II, Section (i)) of the 1974 NBCWA. The evidence reveals that Lone Star's sole disagreement regarding the Construction Work clause was cured by the Union's compromise proposal to limit its applicability so as not to interfere with or contrain Lone Star's ability to hire non-Union personnel under separate terms of employment for

the construction of coke ovens at Starlight. The Court observes that Lone Star's objection to the clause arose after it had provisionally adopted it in the "truce" agreement, and that the Union thereafter extended its offer to compromise the scope of the clause prior to the expiration of the "truce." Under these circumstances, the Court believes Lone Star's opposition to the clause's limitations was resolved prior to the resumption of the strike. Moreover, the Court notes that Lone Star referred to the Clause as "primary" and "work preservation" oriented in its early briefing in this litigation.

48. The Court finds that the Union did not strike to force Lone Star to agree to the "Contracting and Subcontracting" Provision (Article II, Section (g)(1), (2), (3)) of the 1974 NBCWA. The Court finds no credible evidence in the record, absent a passing a reference in Lone Star's December 19, 1974, correspondence, indicating that this clause was a subject of hard disagreement between the parties. Reference to the clause is conspicuously absent in all of Lone Star's future letters which expressly list the contractual provisions barring settlement. As with the Construction and Leasing provisions discussed above, Lone Star cited the Contracting and Subcontracting clause as an example of a "primary", "work preservation" clause to distinguish it from the Successorship and Coal Lands clauses in its 1975 brief. The alleged illegality of the clause was not raised before this Court until June, 1980, over five years after the strike at Starlight commenced.

49. The Court similarly finds, for the reasons stated in Nos. 46, 47, and 48 above, that the "Work Jurisdiction" clause (Article II, Section (a)) of the 1974 NBCWA was not an object of the strike. The language of the clause now contested by Lone Star provides that "Contracting, subcontracting, leasing and subleasing, and construction work, as defined herein, will be conducted in accordance with the provisions of this Article." The sentence is merely a general restatement of the specific provisions that the Court has found not to have been objects of the strike.

## ANALYSIS

### I. Res Judicata and Collateral Estoppel Issues

As a preliminary matter, both parties argue that decisions rendered in various prior proceedings preclude the litigation of claims and issues presented in the instant case.

The Union contends that the decision of the Administrative Law Judge in the parallel unfair practice proceeding, with respect to the legality of the Coal Lands clause, as reviewed by the Board and the Tenth Circuit, collaterally estops Lone Star from again raising the issue here. Secondly, the Union urges that all of the additional issues now asserted by Lone Star are barred under the doctrine of *res judicata* because they were not litigated in the parallel Board proceedings. In response, Lone Star argues that it had no control over the Board proceedings, and that the General Counsel, in prosecuting those proceedings, refused to expand the complaint to include additional allegations despite Lone Star's request to do so. Additionally, Lone Star asserts that the legality of the Coal Lands clause in the § 8(e) context was never finally determined in the parallel proceedings.

In a similar argument, Lone Star seeks to employ the doctrine of "offensive" collateral estoppel to preclude the Union from relitigating issues previously decided against it by the Third Circuit in *Amax Coal Co. v. National Labor Relations Board,* 614 F.2d 872 (3rd Cir.1980), *rev'd on other grounds,* 453 U.S. 322, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981). In *Amax,* the court held that the "Leasing–Licensing Out," Coal Transportation, Repair and Maintenance Work, Construction, and Work Jurisdiction provisions of the 1974 NBCWA were illegal § 8(e) "hot cargo" clauses, and that the Union committed unfair labor practices under § 8(b)(4) by bargaining to impasse over and striking in support of these clauses. The court also held that the Coal Lands and Enabling clauses of the 1974 agreement were non-mandatory contract proposals, and that the Union violated its duty to bargain in good

faith (§ 8(b)(3)) by insisting on these provisions to the point of impasse. Notably, the court did not decide the legality of the Coal Lands Clause under § 8(e).

In 1966, the Supreme Court decided *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966), in which it stated in dicta that *res judicata* principles could be applied to administrative proceedings when the agency was acting in a judicial capacity in resolving disputed issues of fact properly before it which the parties had had an adequate opportunity to litigate. Since then, an overwhelming majority of courts addressing the issue have held that the doctrine of collateral estoppel can apply "offensively" in an action brought under § 303 to preclude a labor organization from relitigating issues previously decided against it in a parallel § 8(b)(4) unfair labor practice proceeding before the National Labor Relations Board.[10] On the defensive side, N.L.R.B. findings favorable to a union have been applied collaterally to preclude relitigation of identical issues by an employer in subsequent court proceedings.[11] Although the Tenth Circuit has never addressed collateral estoppel issues similar to those presented in the instant case,[12] it has indicated its approval of the application of the doctrine, in appropriate circumstances, to final decisions of other administrative agencies. *Long v. U.S. Dep't of Air Force*, 751 F.2d 339, 343–46 (10th Cir.1984); *Taylor v. Heckler*, 738 F.2d 1112, 114–15 (10th Cir.1984); *Neighbors v. Secretary of Health, Education & Welfare*, 511 F.2d 80, 81 (10th Cir.1974).

## A. Res Judicata does not preclude Lone Star from asserting that the Royalty on Purchased Coal Clause was an object of the strike.

■ Upon the entry of a valid, final judgment the *res judicata* rules of merger or bar operate to extinguish the entirety of a plaintiff's claim with respect to all or any part of the transaction, or series of transactions, out of which the claim arose. Restatement (Second) of Judgments § 24 (1982). The rules are subject to the qualification that the party against whom claim preclusion is sought had ample procedural means for fully developing the transaction in the prior law suit. Restatement (Second) of Judgments § 24 comment a (1982). Therefore, Lone Star's capacity to present its entire controversy in the Board proceedings is pivotal to the Union's contention that Lone Star is barred from raising claims which were not litigated before the Board.[13] The Court finds that the Union

10. *See, e.g., Wickham Contracting Co. v. Board of Education*, 715 F.2d 21 (2nd Cir.1983); *Consolidated Express, Inc. v. New York Shipping Ass'n, Inc.*, 602 F.2d 494 (3rd Cir.1979), *vacated on other grounds*, 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980); *Texaco, Inc. v. Operative Plasterers & Cement Masons*, 472 F.2d 594 (5th Cir.1973), *cert. denied*, 414 U.S. 1091, 94 S.Ct. 721, 38 L.Ed.2d 548 (1973), *Paramount Transport Systems v. Teamsters Local 150*, 436 F.2d 1064 (9th Cir.1971); *Tungsten Mining Corp. v. District 50, United Mine Workers*, 242 F.2d 84 (4th Cir.1957); *see generally* Dawson, *Why a a Decision by the NLRB Under 8(b)(4) Should Be Determinative on the Issue of Liability in a Subsequent Section 303 Damage Suit*, 27 Okla.L.Rev. 660 (1974).

11. *See, e.g., Int'l Wire v. Local 38, Int'l Brotherhood of Electrical Workers*, 475 F.2d 1078 (6th Cir.1973), *cert. denied*, 414 U.S. 867, 94 S.Ct. 63, 38 L.Ed.2d 86; *Amcat Corp. v. Int'l Union of Operating Engineers*, 442 F.Supp. 772 (D.Conn. 1977).

12. The scant treatment provided in *Fleming Building Co. v. Northeastern Oklahoma Building & Construction Trades Council*, 532 F.2d 162 (10th Cir.1976) is not immediately helpful on the issues presented here.

13. The Court appreciates that, as a technical matter, it is questionable whether *res judicata*, as distinguished from collateral estoppel, can ever be applied to preclude § 303 "claims" on the basis of prior adjudications in § 8(b)(4) unfair labor practice proceedings. In *International Longshoremen's Union v. Juneau Spruce*, 342 U.S. 237, 72 S.Ct. 235, 96 L.Ed. 275 (1952), the Court held that, although the definition of the wrong in § 303 is borrowed from § 8(b)(4), court proceedings under § 303 are "independent" of § 8(b)(4) unfair labor practice proceedings in the sense that a Board decision is not a prerequisite to the institution of court action under § 303. The Court observed that the National Labor Relations Act specifies two different remedies before two different tribunals for the respective violations, and that each tribunal is entitled to make its own independent decision on the evidence before it. 342 U.S. at 244–45, 72 S.Ct. at 239–40. Since *res judicata* applies to repetitious suits on the same "cause of action,"

has not demonstrated that Lone Star had sufficient control over the scope of the issues presented in the Board proceedings to render *res judicata* the additional clauses Lone Star now asserts as Union strike objectives.[14]

Any person aggrieved by an unfair labor practice may activate the Board's machinery by filing a charge against the alleged offender in a regional NLRB office, but from then on, the responsibility for investigating the charge, deciding whether a formal complaint will issue, drafting the complaint, and prosecuting the case lies within the duties of the regional director. 29 U.S.C. § 160 (1982); 29 C.F.R. §§ 101.2, 101.4, 101.8, 102.9, 102.15 (1985). Should the regional director refuse to issue the complaint, the only recourse open to the charging party is to appeal to the NLRB's General Counsel, whose decision on the matter is final and unreviewable. 29 U.S.C. § 153(d) (1982); 29 C.F.R. § 102.19 (1985); *Vaca v. Sipes*, 386 U.S. 171, 182, 87 S.Ct. 903, 912, 17 L.Ed.2d 842 (1967). The statute also vests the regional director (and on appeal the General Counsel) with discretionary power to determine the specific issues which will and will not become part of the formal complaint. 29 C.F.R. § 102.15 (1985); *see also N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 138–39, 95 S.Ct. 1504, 1510–11, 44 L.Ed.2d 29, 40 (1975); *George Banta, Co., Inc. v. N.L.R.B.*, 686 F.2d 10, 23 n. 17 (D.C.Cir.1982); cert. denied, 460 U.S. 1082, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983). After a complaint is filed, the proceeding enters into an adjudicative stage with a hearing before an ALJ. At this point the role of the regional director becomes prosecutorial. *Kellwood Company, Ottenheimer Bros. Mfg. Div. v. N.L.R.B.*, 411 F.2d 493 (8th Cir.1969). Although the charging party may present evidence, make motions, and call and cross examine witnesses at the hearing, its ability to expand the specific allegations of the complaint is generally subject to the acquiescence of the Board's attorney. *See Winn–Dixie Stores, Inc. v. N.L.R.B.*, 567 F.2d 1343, 1350 (5th Cir.), *cert. denied*, 439 U.S. 985, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978). A proposed amendment to the complaint must also be presented by motion to the ALJ, who has judicial discretion to allow or disallow it. 29 C.F.R. § 102.17 (1985). The practical effect of this scheme is to reduce the charging party's power to frame the issues in contention to a much lower level than that of a plaintiff instituting civil litigation in the courts. Before the NLRB, the charging party is not the "master of the complaint."

Neither the Union's briefs, nor the Court's research, reveals a single case in which *res judicata* principles have been applied to bar a plaintiff in a § 303 action from litigating issues which were not litigated in a parallel Board unfair labor practice proceeding.[15] The courts which have

---

*Commissioner v. Sunnen*, 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948), or stated in the modern sense—transactional "claim," it is doubtful that the doctrine may be applied, to separate actions for distinctive remedies which, with the imprimatur of the highest Court, may lead to inconsistent results. *Compare, e.g., N.L.R.B. v. Deena Artware*, 198 F.2d 645 (6th Cir. 1952) *with United Brick & Clay Workers v. Deena Artware*, 198 F.2d 637 (6th Cir.1952) (Sixth Circuit, on same day, reached inconsistent decisions on § 303 and § 8(b)(4) actions involving identical facts and issues). This, of course, does not mean that collateral estoppel (issue preclusion) is inapplicable under the appropriate circumstances. *See Eazor Express v. General Teamsters Local 326*, 388 F.Supp. 1264 (D.Del. 1975), and cases cited in footnotes 11 and 12, *supra*. Fortunately, the facts of the instant case do not require the Court to delve into the epistemological meanings of "claim" and "cause of action," for the Court holds that the requisite elements of *res judicata* are not established, assuming *arguendo,* the doctrine's general applicability.

**14.** The doctrine of *res judicata* is an affirmative defense which must be proved by the defendant. F.R.Cv.P. 8(c), *Federal Insurance Company v. U.S.*, 618 F.2d 661, 662–63 (10th Cir.1980) (per curiam).

**15.** It is clear beyond cavil that the refusal of the General Counsel to issue a complaint on a § 8(b)(4) charge should not have *res judicata* effect on a subsequent § 303 court action. *Aircraft & Engine Maintenance & Overhaul, Constr., Mfg., Processing & Distrib. v. I.E. Schilling Co.*, 340 F.2d 286, 289 (5th Cir.1965), *cert. denied*, 382 U.S. 972, 86 S.Ct. 528, 15 L.Ed.2d 464 (1966); *see also Edna H. Pagel, Inc. v. Teamsters Local Union 595*, 667 F.2d 1275, 1280 n. 12 (9th Cir.1982) (citing cases).

recognized that certain findings of the Board can have preclusive effect in subsequent court actions have done so only to the extent that the issues were actually litigated and supported by substantial evidence on the administrative record as a whole. *See, e.g., Wickham Contracting Co. v. Board of Education,* 715 F.2d 21, 26 (2d Cir.1983); *Edna H. Pagel, Inc. v. Teamsters Local Union 595,* 667 F.2d 1275, 1280 (9th Cir.1982) (quoting *Paramount Transport Systems v. Chauffeurs, Teamsters & Helpers, Local 150,* 436 F.2d 1064 (9th Cir.1971)). Lone Star asserts that the General Counsel refused to expand the complaint in the unfair labor practice proceedings to include matters in addition to the alleged illegality of the Successorship Clause and the nonmandatory nature of the Coal Lands Clause. Plaintiff's Brief in Response to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Motion for Summary Judgment at 1, (filed July 6, 1981); *see also* Plaintiff's Answers to Defendant's First Set of Interrogatories for 1983 at 70. Lone Star's assertion is not rebutted by the Union. Although the General Counsel's decision not to expand the complaint perhaps represents an estimation of the merits of Lone Star's additional charges, the Court does not believe that it should be accorded *res judicata* effect. Plainly, Lone Star did not have sufficient control over the scope of the matters presented to fairly preclude it from now raising issues which were not litigated.

*B.   Lone Star is not collaterally estopped from asserting that the Coal Lands Clause violates § 8(e).*

■   Collateral estoppel may not be invoked to preclude relitigation of an issue decided in an earlier action unless the issue decided was *essential* to the judgment in the case. *Goss v. Goss,* 722 F.2d 599, 604 (10th Cir.1983). The issues litigated in the

parallel Board proceeding did not address the legality of the Coal Lands Clause in the § 8(e) context. The Regional Director's complaint made no assertion that the clause was illegal. It was only urged to be a nonmandatory subject of collective bargaining. By way of distinction, the Successorship provision of the 1974 NBCWA was claimed at all times to be an illegal "hot cargo" clause in the unfair labor practice adjudications. The only reference to the legality of the Coal Lands Clause appears in the opinion of ALJ, wherein he made the following comment: "It is not alleged to be unlawful, and I conclude it is not." As noted above, the Tenth Circuit reinstated the ALJ's finding that the clause constituted a nonmandatory subject of collective bargaining, while expressly declining to comment on the clause's legality. The reason the court refused to rule on the legality of the clause is clear. That decision was not necessary or "essential" to resolve any of the issues in the case. The question presented to the court was whether the Union violated its duty to bargain in good faith by bargaining to impasse and striking in support of the Coal Lands Clause, *not* whether the clause was violative of § 8(e).[16] Upon review of the entire administrative record, this Court finds that the legality of the Coal Lands Clause was never at issue in the Board proceedings, and, that the passing comment of the ALJ was unnecessary to support the judgment he entered. Therefore, the Union may not employ collateral estoppel to preclude Lone Star from now asserting the illegality of the Coal Lands clause.

*C.   The Union is not collaterally estopped by the decision in Amax Coal Co. v. N.L.R.B.*

In light of the Court's factual determinations on the objects of the strike at Star-

---

**16.** Of course, bargaining to impasse over an illegal § 8(e) clause also constitutes a violation of the § 8(b)(3) duty to bargain in good faith. But in the absence of a clear ruling on the point, this Court is not willing to speculate that the Tenth Circuit predicated its § 8(b)(3) finding on a conclusion that the clause violated § 8(e). Neither can the Court assume, as the Union

would have it, that the Circuit implicitly found the clause legal by deeming it a nonmandatory subject of collective bargaining. Nowhere in the court's opinion is the clause referred to as "permissive." *Lone Star v. National Labor Relations Board,* 639 F.2d 545 (10th Cir.1980), *cert. denied,* 450 U.S. 911, 101 S.Ct. 1349, 67 L.Ed.2d 335 (1981).

light, it is unnecessary to decide, as a matter of law, whether the Union is "offensively" precluded from relitigating the legality of the clauses held unlawful in *Amax, supra.* Collateral estoppel, be it "offensively" or defensively applied, only precludes relitigation of issues *actually litigated* in a prior action. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 327 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979); *Matter of Lombard,* 739 F.2d 499, 502 (10th Cir.1984). Neither the Coal Lands Clause, nor the Royalty on Purchased Coal Clause was addressed in the § 8(e) context by the Third Circuit in *Amax.* Therefore, Lone Star may not estop the Union from denying the illegality of those clauses here.

## II. Section 8(e) Issues

The Court next addresses the legality of the Coal Lands and the Royalty on purchased coal clauses under § 8(e). 29 U.S.C. § 158(e) (1982). At the outset it is important to note that the strike at Starlight turned upon Lone Star's refusal to *adopt* the disputed clauses, and, thus, the issues are not framed with reference to an attempt by the Union to *enforce* those provisions. The absence of a concrete factual scenario in which the Union sought to invoke the challenged clauses practically limits the Court's analysis, as it would in the majority of § 303 actions predicated only upon an alleged violation of § 8(b)(4)(i), (ii)(A), to a "facial" or *per se* assessment of legality. *See A. Duie Pyle, Inc. v. N.L.R.B.,* 383 F.2d 772, 777 (3rd Cir.1967), *cert. denied,* 390 U.S. 905, 88 S.Ct. 819, 19 L.Ed.2d 871 (1968) (noting the undesirability of determining the conscious objective of a union in obtaining the inclusion of a challenged provision in a collective bargaining agreement on a bare stipulation of facts which supplies no indication of purpose or intention beyond the language of the provision and the general bargaining history); *cf. Collier v. Hoisting & Portable Engineers Local Union Number 101,* 761 F.2d 600, 602 (10th Cir.1985) (in § 8(b)(4)(i), (ii)(B) action secondary purpose is a factual question wherein the jury is to consider under all the surrounding circumstances whether union picketing was motivated by an unlawful objective).

■ A wide variety of contractual provisions covering a multitude of labor and management objectives may be voluntarily included in a collective bargaining agreement without transgressing § 8(e). *See generally* R. Gorman, Basic Text on Labor Law: Unionization & Collective Bargaining 496–529 (1976). Contractual provisions designed to retain work traditionally performed by bargaining unit employees or intended to reduce a signatory employer's incentive to transfer work to less costly non-union operations do not violate the statute if the union's efforts are directed at its own employer on a topic that the employer can control. *N.L.R.B. v. Int'l Longshoremen's Ass'n,* 473 U.S. 61, 105 S.Ct. 3045, 3057, 87 L.Ed.2d 47 (1985). Although in practice, valid work preservation and "union standards" provisions do impinge upon a contracting employer's leeway to subcontract work or otherwise shift production, these effects are merely incidental to the operation of the valid clause, and, thus, irrelevant in the § 8(e) context. *Id.,* 105 S.Ct. at 3056; *Frito–Lay, Inc. v. Retail Clerks Union Local No. 7,* 629 F.2d 653, 659 (10th Cir.1980). On the other hand, clauses which are tactically calculated to further a union's institutional objectives through the imposition of restraints on a signatory employer's freedom to do business with, or otherwise handle the products of, a nonsignatory employer, fall within the category of agreements outlawed by § 8(e). *Lone Star Steel,* 639 F.2d at 551 (10th Cir.1980), *cert. denied,* 450 U.S. 911, 101 S.Ct. 1349, 67 L.Ed.2d 335 (1981).

■ The reach of § 8(e) extends only to the prohibition of "secondary" pressures. *National Woodwork Manufacturers Ass'n v. N.L.R.B.,* 386 U.S. 612, 638, 87 S.Ct. 1250, 1265, 18 L.Ed.2d 357 (1967) (*National Woodwork*); [17] *accord, N.L.R.B. v. Inter-*

---

**17.** In *National Woodwork,* a § 8(b)(4)(i), (ii)(B) case, the Court upheld a clause which precluded the primary employer from using precut doors in order to preserve the traditional work of cutting doors for the unit employees. The Court suggested that it might have reached a different result had the clause been used as a "sword" to reach out and acquire new work

*national Longshoremen's Ass'n,* 473 U.S. 61, 105 S.Ct. 3045, 3053, 87 L.Ed.2d 47 (1985). Because the general purpose of the ban on secondary pressures is to protect neutral employers from becoming embroiled in labor disputes a contracting union has with another employer, *Frito–Lay, Inc. v. Retail Clerks Union Local Number 7,* 629 F.2d 653, 659 (10th Cir.1980), § 8(e) proscribes agreements which are aimed at pressuring outside employers to submit to union objectives. *In re Bituminous Coal Wage Agreements (Duquesne Light Company),* 756 F.2d 284, 289 (3rd Cir.1985), *cert. denied,* 474 U.S. 863, 106 S.Ct. 180, 88 L.Ed.2d 149 (1985). In *National Woodwork* the Supreme Court set forth the following analytical framework for distinguishing "primary" from "secondary" agreements, emphasizing that such a determination requires a very careful examination of the facts:

> "The determination whether the [agreement] ... violated § 8(e) ... cannot be made without an inquiry into whether, under all the surrounding circumstances,[38] the Union's objective was preservation of work for [the primary employer's] employees, or whether the agreements ... were tactically calculated to satisfy union objectives elsewhere.
>
> . . . .
>
> There need not be an actual dispute with the [secondary] employer, ..., for the

rather than as a "shield" to retain the jobsite work of the bargaining unit employees. 386 U.S. at 630, 87 S.Ct. at 1260, 18 L.Ed.2d at 370.

18. In its review of the Successorship clause the Tenth Circuit stated: "the statutory language [of § 8(e) ] provides two distinct and alternative tests for finding a violation—the first prohibiting an agreement by an employer to 'cease or refrain from handling, using, selling, [transporting] ... or otherwise dealing in any of the products of any other employer;' the second prohibiting an agreement by an employer to 'cease doing business with any other person.' *Lone Star Steel v. N.L.R.B.,* 639 F.2d 545 (10th Cir.1980); *cert. denied,* 450 U.S. 911, 101 S.Ct. 1349, 67 L.Ed.2d 335 (1981). These tests were derived from the general guidelines established by the Supreme Court in *National Woodwork* and were applied with an eye toward identifying the union objectives which motivated the challenged provision.

activity to fall within ... [the secondary category], so long as the tactical object of the agreement and its maintenance is that employer, or benefits to other than the [primary] ... employees *or other employees of the primary employer* thus making the agreement ... secondary in its aim. (footnote omitted) The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer vis-a-vis his own employees." (footnote omitted)

"38. As a general proposition, such circumstances might include the remoteness of displacement by the banned product or services, the history of labor relations between the union and the employers who would be boycotted, and the economic personality of the industry."

386 U.S. at 644–45, 87 S.Ct. at 1268–69, 18 L.Ed.2d at 378. *See also ILA II,* 105 S.Ct. at 3054.[18] On numerous occasions the Supreme Court has observed that the distinction between "primary" and "secondary" can be "more nice than obvious," however in the present case, the Court concludes that neither the Coal Lands nor the Royalty on purchased coal clauses of the 1974 NBCWA, *as written,* can be fairly characterized as violative of § 8(e).

### A. The Coal Lands Clause Does Not Violate Section 8(e).

Since the Coal Lands Clause was first included in UMW contracts in 1943,[19]

19. The origin of the Coal Lands Clause may be traced to a 1943 order of the National War Labor Board directing the inclusion of a provision into each UMW contract which required all coal operators to agree not to lease their mines to third parties "as a subterfuge" to avoid having to comply with the substantive provisions of the collective bargaining agreement. *See Lewis v. Pennington,* 257 F.Supp. 815, 824 (E.D.Tenn. 1966), modified, 400 F.2d 806 (6th Cir.1968), *cert. denied,* 398 U.S. 960, 90 S.Ct. 2177, 26 L.Ed.2d 546 (1970); *see also Ramsey v. United Mine Workers,* 265 F.Supp. 388 (E.D.Tenn.1967), *rev'd on other grounds,* 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971), (providing a concise chronology of all the historical developments discussed herein). Since 1943, the clause, in one form or another, has been incorporated into every UMW contract. *See, Smitty Baker Coal Co. v. United Mine Workers,* 620 F.2d 416, 436–37 (4th Cir.), *cert. denied,* 449 U.S. 870, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980).

neither the Board nor any court has found that it violates § 8(e) on its face. *See e.g., Riverton Coal Co. v. U.M.W.,* 79 L.R.R.M. 2348, 2365 (S.D.Ohio 1970) [available on WESTLAW, 1970 WL 792], *rev'd on other grounds,* 453 F.2d 1035 (6th Cir.), *cert. denied,* 407 U.S. 915, 92 S.Ct. 2439, 32 L.Ed.2d 690 (1972). Moreover, the Court's research reveals no case in which the clause was held to have been enforced in an illegal manner. The Tenth Circuit has decided that the clause constitutes a non-mandatory bargaining subject,[20] but, as noted above, this finding does not automatically place the provision within the realm of matters prohibited by § 8(e).

Lone Star argues that the Coal Lands Clause "automatically forces an illegal UMWA agreement on any location merely owned by the primary employer regardless of whether another company operates the location." Furthermore, it contends that because the clause requires "the other employer" to employ only UMWA employees it violates § 8(e) on its face. Finally Lone Star urges that the modification rendering the clause applicable only when the Union becomes the employee's bargaining agent is "meaningless" in light of the Union's ability to strike for recognition and the achievement of the "illegal" contract as a combined goal.

Lone Star's arguments are singularly unpersuasive in light of the express language of the clause and the negotiated interpretation that it would become operable only after the Union had established itself as the recognized bargaining agent of the employees on the newly developed coal lands. Contrary to Lone Star's assertion, the clause does not apply to "other employer[s]" generally—it simply does not address independent entities. In light of the provisions specifically directed at limiting the signatory's right to sell, contract, lease, and license out its coal lands (Art. I (successorship); Art. II §§ (g), (h)), the Court does not construe the very general language of the Coal Lands clause as imposing potential alienation or leasing restraints on Lone Star. *Cf., Lone Star Steel Co. v. N.L.R.B.,* 639 F.2d 545, 553 (10th Cir.1980), *cert. denied,* 450 U.S. 911, 101 S.Ct. 1349, 67 L.Ed.2d 335 (1981) (specific provisions in 1974 NBCWA covering leasing and subcontracting would be "mere surplusage" if successorship clause is read as applying to lessees and subcontractors).

The Coal Lands clause is only applicable to Lone Star and to members of its corporate family. Nothing in the language of the clause suggests that its implementation would lead to the cessation of business between Lone Star and another employer with whom the Union has a dispute.[21]

20. The Tenth Circuit and the ALJ found the clause to be both under and over inclusive in pursuing the objective of work and standards preservation. It was observed that the clause did not apply to non-Union operations. If it so desired, Lone Star could commence coal mining operations at another facility geographically proximate to Starlight, with freedom to hire non-Union employees at lower wages than it was contractually bound to pay the Union members at Starlight. Alternatively, the clause would bind Lone Star to apply the contract to phases of coal production that were unrelated to the actual mining of coal (the work of the bargaining unit employees). Further, the clause was not limited to the application of the contract's economic provisions, it required Lone Star to adopt the agreement *in toto.* As the ALJ noted, the clause could easily have been drafted more narrowly, and effectively, to protect union standards and preserve the primary employees' work.

At the heart of the Tenth Circuit's decision lies the observation that the clause's language sweeps too broadly to bring it within the matters that, by law, must be resolved through collective bargaining. Because the clause is not carefully drafted to present a "direct frontal attack upon a problem thought to threaten the maintenance of the basic wage structure established by the collective bargaining contract," it is not sufficiently vital to the employee's interests to be deemed a mandatory subject of collective bargaining. *Lone Star Steel Co. v. N.L.R.B.,* 639 F.2d 545, 558–59 (10th Cir.1980), *cert. denied,* 450 U.S. 911, 101 S.Ct. 1349, 67 L.Ed.2d 335 (1981) (*quoting Teamsters Union v. Oliver,* 358 U.S. 283, 294, 79 S.Ct. 297, 304, 3 L.Ed.2d 312 (1959)).

21. Although it is not difficult to hypothesize a scenario in which the Union might resort to unlawful means to *enforce* the Coal Lands Clause, (for example by striking at Starlight to force Lone Star not to do business with vertical coal-related operations subsequently established by an affiliated company who refuses its Unionized employees' demands to implement the national contract), this alone does not render the

*Standing alone,* the clause does not have the negative effect on commerce that § 8(e) prohibits.[22] As noted by the Tenth Circuit in *Lone Star, supra.,* "the implementation of the clause could only affect unit jobs *if the company opened another mine.*" 639 F.2d at 559.

Under the negotiated interpretation, the Union may not employ the Coal Lands Clause as a means of effectuating unionization of employees at other coal facilities through coercion of neutral parties. The clause does not compel a signatory employer to annul any present or future business relationships with nonsignatory affiliates who refuse to recognize or bargain with the Union. Lone Star and nonsignatory affiliates alike are free to repudiate the agreement at projects where the Union is not recognized as the employees' representative. Thus, the clause does not create a "top-down" pressure for unionization which removes the representation decision from the hands of the employees and places it in the hands of the employers. *Woelke & Romero Framing, Inc. v. N.L.R.B.,* 456 U.S. 645, 663–64, 102 S.Ct. 2071, 2081–82, 72 L.Ed.2d 398 (1982).

At most, Lone Star's adoption of the provision might have an incidental, ameliorative effect on the the Union's unilateral efforts to organize employees at other Lone Star facilities, but this, however, does not transform a legal, albeit nonmandatory, bargaining subject into a "hot cargo" clause.[23] Although Lone Star ascribes an illegal, secondary motive to the language of the clause because of its potential usefulness as an enlistment device, the Tenth Circuit's opinion indicates that the court would have found the Coal Lands clause to be a mandatory subject of collective bargaining if it was limited to the adoption of the economic provisions of the national agreement at newly developed coal mining operations. Consequently, even if the clause was more narrowly drawn as indicated, the subordinate impact upon the Union's organizational capacities would remain relatively unchanged. The Union would still be able to offer Lone Star's non-Union coal miners the perquisite of a national wage scale in exchange for their authorization cards or votes in an N.L.R.B. representation election. In sum, the Court finds that the incidental effect of the clause is consequential to its overarching, lawful purpose of preserving the work of the Starlight miners, and does not betray an underlying secondary objective to further the Union's institutional interests elsewhere.

The Court concludes that, under all the surrounding circumstances, the purpose of the Coal Lands clause is to erect a "shield" to retain the work of the bargaining unit employees and reduce Lone Star's incentive

clause violative of § 8(e) *on its face. See N.L. R.B. v. Enterprise Ass'n of Steam & General Pipefitters (Austin Co.),* 429 U.S. 507, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977) (a union may not strike to enforce an otherwise lawful work preservation clause by means that would violate § 8(b)(4)(i), (ii)(B)).

**22.** Lone Star's position that if it were to agree to the Coal Lands clause it would then be bound to adopt (or submit to arbitration on) other allegedly illegal clauses in the 1974 NBCWA is similarly misplaced, and in fact amounts to a "backdoor" attempt to place the entire national agreement into contention *in this litigation.* The adoption of this clause in the agreement covering the employees at Starlight surely cannot constitute a "waiver" of Lone Star's rights to object, file unfair labor practice charges, or institute litigation should the Union subsequently violate the Act at other locations. The critical distinction in this case is that the sole objects of the strike at Starlight were the Coal Lands and Royalty clauses. The content of these clauses

are sufficiently independent of the other provisions in the agreement as to eliminate any need to commence an inquiry based upon a theory of inosculation. In sum, "hot cargo" clauses may well reside within the fifty-two pages of the 1974 NBCWA, but they are not at issue here because the strike at Starlight was not in furtherance of Union objectives to force or require Lone Star to agree to them.

**23.** An agreement by which an employer agrees to preserve work for the contracting employees will inevitably affect other employers (and their employees). However, "[t]he effect of work preservation agreements on the employment opportunities of [others], is of course irrelevant to the validity of the agreement so long as the union had no forbidden secondary purpose." *Frito–Lay, Inc. v. Retail Clerks Union Local No. 7,* 629 F.2d 653, 659 (10th Cir.1980) (quoting *N.L.R.B. v. International Longshormen's Ass'n,* 447 U.S. 490, 508 n. 22, 100 S.Ct. 2305, 2315 n. 22, 65 L.Ed.2d 289 (1980)).

to shift or otherwise transfer that work elsewhere. Since the clause does not, on its face, require Lone Star to cease or refrain from dealing in the products of another employer, and does not require the signatory employer to interrupt business relations with any other person, the Court concludes that it is primary in effect and, therefore, it does not violate § 8(e).

*B. The Royalty on Purchased Coal Clause Does Not Violate § 8(e).*

■ Under the terms of the Royalty clause, Lone Star must contribute to the Union Health and Retirement Funds an equal amount per ton of coal whether it mines the mineral itself or purchases it from third parties who have not already paid the contribution on the assessed tonnage. Lone Star contends that the clause imposes a "penalty" on coal purchased from nonsignatories and therefore violates § 8(e) on its face. Additionally, Lone Star argues that the clause is unlawful because, when read in conjunction with other provisions of the 1974 NBCWA (which the Court has concluded are not at issue in this litigation), it would require nonsignatory lessees or subcontractors to assume the obligation of contributing to the Union trust funds as a condition of doing business with Lone Star. The Union maintains that the object of the clause is primary—intended to benefit the Starlight Miners by assuring the integrity of their Health and Retirement Funds.

The facial validity of the current Royalty provision was recently upheld by the Third Circuit in *In Re Bituminous Coal Wage Agreements (Duquesne Light Co.)*, 756 F.2d 284 (3rd Cir.), *cert. denied*, 474 U.S. 863, 106 S.Ct. 180, 88 L.Ed.2d 149 (1985). The Third Circuit found that the language of the clause as it appears on the face of the national contract cannot be construed as giving rise to a *per se* violation of § 8(e),

and that § 8(e) liability, if any, could only be determined in reference to particular applications of the clause to discrete transactions. *Id.* at 293. In the absence of individualized fact finding by the district court, the Third Circuit was unable to declare the clause invalid under § 8(e).

The Court is in substantial agreement with the reasoning espoused by the Third Circuit in *Duquesne Light Co.* To be sure, the instant case arises in a somewhat different posture than *Duquesne Light Co.* as that case involved, *inter alia*, claims by employers for declaratory relief and damages ensuing from the operation of the Royalty clause after it had been incorporated into agreements which they had signed and after purchases of non-union coal had been made. But, both the lack of factual development in the record with regard to the application of the Royalty clause to individual coal purchases and the claims asserted for and against the clause's legality in *Duquesne Light Co.*, are strikingly similar to the record and claims presented in the instant litigation. Simply put, Lone Star, like the plaintiffs in *Duquesne Light Co.*, has failed to establish facts and present evidence which would tend to prove that unlawful secondary effects would reasonably result from the application of the Royalty clause to its unique coal purchasing needs and practices. Therefore, adopting the Third Circuit's reasoning that the § 8(e) validity of the Royalty on purchased coal clause cannot be ascertained absent a showing of secondary effects arising out of individual purchases of non-union coal, the Court agrees that the clause does not violate § 8(e) on its face. Because Lone Star has failed to present the above-described evidence, the Court concludes that the Union has not violated § 8(b)(4)(i), (ii)(A) in striking to force Lone Star to adopt the clause.[24]

---

**24.** Lone Star may take solace in the fact that pursuant to the Supreme Court's decision in *Kaiser Steel v. Mullins*, 455 U.S. 72, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982) the legality of the Royalty provision can be raised in defense to an action by the Health and Retirement Fund Trustees for delinquent or past due contributions. In *Kaiser Steel*, the legality of the clause

was not at issue and was not decided, but, Justice White did observe that if the clause is illegal, "it is because of the financial burden which the agreement attached to purchases of coal from non-UMW producers even though they may have contributed to other employee welfare funds." 455 U.S. at 79, 102 S.Ct. at 857.

### III. Antitrust Issues

Lone Star's complaint in No. 79–36 alleges that the defendants in striking to force Lone Star to adopt the 1974 NBCWA have engaged in "monopolistic practices, unreasonable restraints of trade and other violations of the Sherman and Clayton Acts" causing injury to Lone Star's business and property contrary to §§ 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1, 2 (1982).[25] Complaint at ¶ 1. In support of these general allegations, Lone Star asserts that the Successorship and Coal Lands clauses,[26] if adopted, would have the effect of foreclosing or restricting competition among third party employers for work offered by Lone Star. Complaint at ¶ 9. Lone Star further contends that the Successorship and Coal Lands provisions constitute unlawful restraints of trade because they dictate the terms on which third parties may do business with Lone Star. *Id.*

Lone Star's complaint goes on to allege that the Union's strike to achieve the above-stated provisions caused a complete shutdown of the Starlight Mine for over three years, and further resulted in 1) "a substantial increase in the per ton cost of coke to [Lone Star's] blast furnace ... as compared with an average base per ton cost of coke to the blast furnace prior to the commencement of the strike, ..."; 2) a "substantial increase in the cost of security and guard service"; and 3) "[t]he total cessation of coal production at [Lone Star's] mine located at McCurtain, Oklahoma, while [Lone Star] has incurred and continues to incur idle plant expenses during the period of total plant cessation." Complaint at ¶ 10. These allegations comprise the sum and substance of the damages plead by Lone Star as resulting from the Union's alleged violation of the antitrust laws.

In response to Lone Star's antitrust complaint, the Union contends that Lone Star failed to state a cause of action under the antitrust laws and, that in any event, the Union's conduct at the Starlight Mine constituted unilateral activity shielded by the statutory labor exemptions to the antitrust laws.

Upon review of Lone Star's claims and the evidence presented in support thereof, the Court concludes that Lone Star has not suffered injuries from the alleged antitrust violation and thus does not have standing to raise its antitrust claim. At the outset, the Court observes that no agreement was ever reached between the parties and that all of the damages alleged by Lone Star are the result of the Union's unilateral strike activity against it. Standing to assert an antitrust violation is measured by the following two-prong test set forth in *Farnell v. Albuquerque Publishing Co.*, 589 F.2d 497, 500 (10th Cir.1978):

First, [plaintiff] must allege injury to his "business or property" within the mean-

---

**25.** Section 1 of the Sherman Act provides in relevant part that "[E]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, ..., is ... illegal.

Section 2 of the Sherman Act provides that "[E]very person who shall monopolize or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, ..., shall be deemed guilty of a felony, ...

Sections 4 and 16 of the antitrust laws provide civil remedies for private businesses injured by the violation of Sections 1 and 2. Lone Star's complaint additionally alleges that the defendants have violated Sections 13, 15, 18, and 45(a)(1) of the antitrust laws.

**26.** Although the Successorship and Coal Lands clauses are not specifically named in Lone Star's complaint, the allegations contained therein can only be read as referring to these provisions. Paragraph 8, which is the only portion of the complaint that states facts in support of the claims, provides as follows:

.8) That since approximately February of 1975, Defendants, ..., have been engaged in collective bargaining, and a strike to force the Plaintiff herein to execute a collective bargaining contract which would, among other things, require Plaintiff to cease doing business with other employers who are not United Mine Workers of America ... signators; to prohibit the sale of assets or the business itself in whole or in part to non-UMWA signators; and to apply the substantive terms of the 1974 National Bituminous Coal Wage Agreement to other affiliated employers and subsidiaries of the Plaintiff, and further requiring that all coal lands owned by the employer or its affiliates and subsidiaries be licensed only to employers willing to assume the UMWA and its contract.

ing of the Act, and second, he must show proximate causation—that the injury directly resulted from a violation of the antitrust laws.

The second prong of the test (proximate causation) was more fully addressed by the Tenth Circuit in *Reibert v. Atlantic Richfield Co.*, 471 F.2d 727, 731 (10th Cir.), *cert. denied*, 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 399 (1973) wherein the court observed as follows:

> Two elements are necessary to demonstrate proximate cause: (1) there is a causal connection between an antitrust violation and an injury sufficient to establish the violation as a substantial factor in the occurrence of damage; and (2) that the illegal act is linked to to a plaintiff engaged in activities intended to be protected by the antitrust laws.

The allegations in the present case, taken in the light most favorable to Lone Star, demonstrate no causal connection between the alleged antitrust violation and the damages putatively suffered by Lone Star as a result of the violation. Therefore, Lone Star's antitrust claims must fail for want of the prerequisite injury necessary to support a private antitrust law suit.

Lone Star alleges that its injuries were caused by the Union's strike to force it to agree to a contract which, *if adopted*, would have necessarily caused anticompetitive effects contrary to the antitrust laws.[27] The failure in Lone Star's theory lies in the admitted fact that the injury to Lone Star's business caused by the strike does not reflect the anticompetitive effect of an antitrust violation, nor does it reflect the consequences of anticompetitive acts made possible by an already existing antitrust violation. *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.* 429 U.S. 477, 489, 97 S.Ct. 690, 697–98, 50 L.Ed.2d 701 (1977); *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 125, 89 S.Ct. 1562, 1577, 23 L.Ed.2d 129 (1969). The price increases complained of by Lone Star in this case are not the result of a dampening of competitive market forces, *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 482–83, 102 S.Ct. 2540, 2550, 73 L.Ed.2d 149 (1982), or an illegal agreement between the Union and another party with the purpose or effect of transgressing the antitrust laws.[28] Indeed, the complaint itself fairly expresses that the antitrust injuries complained of would only arise upon the *execution* of the collective bargaining contract. Since no contract was ever executed between the parties, the necessary causal connection between the alleged violation and resultant injury is absent.[29]

**27.** It should be noted that this action does not proceed under Section 16 of the Clayton Act. Under Section 16, the injunctive relief provision, a plaintiff may sue for *threatened* damage or loss resulting from a violation of the antitrust laws. This suit is brought under Section 4, the treble damages provision, which requires injury in fact. *Monfort of Colorado, Inc. v. Cargill, Inc.*, 761 F.2d 570, 573–74 (10th Cir.1985), *cert. granted*, 474 U.S. 1049, 106 S.Ct. 784, 88 L.Ed.2d 763 (1986).

**28.** In the absence of any agreement whatsoever, the facts of this case are wholly inapposite to the facts of any of the Supreme Court decisions concerning the scope of labor's antitrust exemptions. In all of these cases (which Lone Star inappropriately relies upon) an agreement between a union and an employer or a non-labor third party was already in effect when suit was commenced, and it was the *agreement itself* which constituted the focus of the Court's antitrust analysis. *See Connell Construction Co., Inc. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975); *Meat Cutters v. Jewel Tea Co.*, 381 U.S.

676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Allen Bradley Co. v. Electrical Workers*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945). For the same reason, this case is distinguishable from the cases which have addressed the antitrust implications of the 1974 NBCWA. *See Duquesne Light Co.*, 580 F.Supp. 670 (W.D.Penn.1984), *vacated*, 756 F.2d 284 (3rd Cir.), *cert. denied*, 474 U.S. 863, 106 S.Ct. 180, 88 L.Ed.2d 149 (1985); *Feather v. U.M.W.*, 494 F.Supp. 701 (W.D.Penn.1980), *aff'd in part and rev'd in part*, 711 F.2d 530 (3rd Cir.1983); *see also Smitty Baker Coal Co. v. U.M.W.*, 620 F.2d 416 (4th Cir.), *cert. denied*, 449 U.S. 870, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980). Lone Star does not allege the existence of an anticompetitive agreement between the Union and any other party as grounds for its antitrust claim.

**29.** Carried to its logical conclusion, Lone Star's theory would vest standing to sue for an antitrust violation in any third party who has been unable to maintain business operations with an employer whose unionized employees are on

Even if it were true as Lone Star alleges, that the Successorship and Coal Lands provisions would, in operation, "restrict other employers" from "competing for work offered by Lone Star, and [foreclose them] from otherwise doing business with [Lone Star]," or dictate the terms upon which such business could be done, these restraints could not be responsible for the injuries which Lone Star asserts herein.[30] In sum, the injuries actually suffered by Lone Star are the direct effect of the Union's unilateral work stoppage, and, as such, are identical in cause and effect to the damages claimed for the alleged § 8(e) violation in the consolidated case. In 1919, the Supreme Court, in a different context, set forth the rule that incidental injuries suffered as a result of unilateral refusals to deal are not remediable through the antitrust laws. *United States v. Colgate & Company*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). Although criticized by commentators, the rule remains viable. *See Fuchs Sugars and Syr-ups, Inc. v. Amstar Corp.*, 602 F.2d 1025 (2d Cir.), *cert. denied*, 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979); *Hester v. Martindale–Hubbell, Inc.*, 493 F.Supp. 335, 340, (E.D.N.C.1980), *aff'd*, 659 F.2d 433 (4th Cir.1981), *cert. denied*, 455 U.S. 981, 102 S.Ct. 1489, 71 L.Ed.2d 691 (1982). By analogy to the instant case, the Union's "refusal to deal" with Lone Star damaged it in a manner outside the scope of antitrust, and remediable, if at all, through resort to the labor laws specifically designed to address these matters. Absent an agreement between the parties containing the challenged provisions this suit is premature. Therefore, the Court concludes as a matter of law that the injuries suffered by Lone Star were not proximately caused by the alleged antitrust violations asserted in its complaint, and thus, Lone Star does not have antitrust standing to challenge the Union's conduct. *See Monfort of Colorado, Inc. v. Cargill, Inc.*, 761 F.2d 570, 573–74 (10th Cir.1985), *cert.*

---

strike. If the third party could establish that the Union's strike objects, if successful, would illegally restrain trade between it and the struck employer it would be entitled to recover three-fold the damages it has suffered as a result of the strike. Under this scenario a multitude of plaintiffs would be entitled to exorbitant damage recoveries, wholly out of proportion to the alleged "violation." *Cf. Montreal Trading Ltd. v. Amax Inc.*, 661 F.2d 864, 867–68 (10th Cir.1981), *cert. denied*, 455 U.S. 1001, 102 S.Ct. 1634, 71 L.Ed.2d 868 (1982).

**30.** The Court in no way intimates that the Successorship or Coal Lands clauses violate the antitrust laws. Nor does the Court imply that, if the requisite injury was proved, Lone Star could recover treble damages for the Union's strike to force Lone Star to adopt these clauses. Indeed, the statutory language of Section 6 of the Clayton Act which provides, *inter alia*, that nothing in the antitrust laws shall "forbid or restrain individual members of . . . [labor] organizations from lawfully carrying out the legitimate objects thereof, nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws," clearly indicates congressional intent to exempt the kind of *unilateral* activities present in this case. *See Berman Enterprises Inc. v. Int'l Longshoremen's Ass'n*, 644 F.2d 930 (2d Cir.), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 381 (1981) (holding an "affiliates" clause much like the Coal Lands clause legal under rule of reason analysis).

Moreover, in a pre-trial conference, Lone Star's counsel abandoned rule of reason analysis in favor of its allegation that the disputed provisions constitute a *per se* violation of the Sherman Act. Pre-trial conference held February 7, 1984, record at 12. In the absence of any evidence demonstrating that the purpose or effect of the disputed provisions is that of "raising, depressing, fixing, pegging, or stabilizing" prices, or evidence showing that a rule of reason analysis would be complex, time consuming, and ultimately uncertain, the Court would be extremely hesitant to conclude that these clauses give rise to such a pernicious effect on competition as to render them presumptively illegal without inquiry into their precise harm. *See Northern Pacific Railway v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). The Court also notes that a number of courts have observed that, in light of the statutory and nonstatutory labor exemptions and the mutual incompatibility between national labor policy and national antitrust policy, *per se* analysis may be inappropriate to antitrust claims against a labor union for engaging in labor-related activities. *See e.g., Commerce Tankers Corp. v. National Maritime Union*, 553 F.2d 793, 801–02 (2d Cir.), *cert. denied*, 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977) (*per se* analysis inappropriate); *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1177–82 (D.C.Cir.1978) (*per se* analysis inappropriate).

*granted,* 474 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986).

## CONCLUSIONS OF LAW

1. Jurisdiction in this court is properly invoked under 29 U.S.C. § 187 and 15 U.S. C. § 1, *et seq.* (1982).

2. Plaintiff is not collaterally estopped to assert the illegality of the Coal Lands clause under 29 U.S.C. § 158(e) (1982).

3. Plaintiff is not precluded from raising issues which were not litigated before the National Labor Relations Board.

4. Defendant is not collaterally estopped to deny the illegality of the Coal Lands clause or the Royalty on purchased coal clause under 29 U.S.C. § 158(e).

5. The Coal Lands clause contained in Article II(f) of the 1974 NBCWA on its face does not violate 29 U.S.C. § 158(e) (1982).

6. Defendants did not violate 29 U.S.C. § 158(b)(4)(i), (ii)(A) (1982) by inducing a strike among plaintiff's employees with the object of forcing or requiring plaintiff to agree to the Coal Lands clause.

7. The Royalty on purchased coal clause contained in Article XX(d)(1) of the 1974 NBCWA on its face does not violate 29 U.S.C. § 158(e) (1982).

8. Defendants did not violate 29 U.S.C. § 158(b)(4)(i), (ii)(A) (1982) by inducing a strike among plaintiff's employees with the object of forcing or requiring plaintiff to agree to the Royalty on purchased coal clause.

9. Plaintiff is not entitled to recover damages under § 303 of the Labor Management Relations Act, 29 U.S.C. § 187 (1982).

10. Plaintiff does not have standing to assert an antitrust violation under 15 U.S. C. § 1, *et seq.* (1982) based upon defendants' unilateral activity which did not culminate in the execution of an agreement.

11. Plaintiff is not entitled to recover treble damages under the Sherman and Clayton Antitrust Acts, 15 U.S.C. § 1, *et seq.* (1982).

WHEREFORE, premises considered, it is the Order of the Court as to the issues of liability in the consolidated cases Nos. 75–92–C and 79–36–C that the defendants United Mine Workers of America and Local Union No. 9313 shall be and hereby are awarded judgment as against plaintiff Lone Star Steel Company.